**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Wayne Cedric BELL, Defendant-Appellee.**

No. 84–3534.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 22, 1985.

Decided May 22, 1985.

Randolph Baxter, Chief, Appellate Litigation Div., Cleveland, Ohio, Frederick H. McDonald, Asst. U.S. Atty., Patrick Foley, argued, Toledo, Ohio, for plaintiff-appellant.

Peter J. Pitkin, argued, Toledo, Ohio, for defendant-appellee.

Before MARTIN and JONES, Circuit Judges, and PORTER, Senior District Judge.[*]

DAVID S. PORTER, Senior District Judge.

The United States appeals from an order suppressing an automatic handgun seized from Wayne Bell by an agent of the Federal Bureau of Investigation following a frisk which occurred as a result of Bell's presence in an automobile with an individual being arrested on a felony warrant. Jurisdiction lies under 18 U.S.C. § 3731 (1984). We reverse the suppression order and remand this case to the district court for further proceedings.

## I.

In the course of a multijurisdictional investigation into a food stamp trafficking ring operating in Toledo, Ohio, FBI agents obtained a warrant for the arrest of Earl Cherry. Cherry was the lieutenant of Hassid Abdul Risk, who was believed to be running the operation. Risk was known to have illegally sold handguns to undercover agents.

In addition to his activities involving food stamps, Cherry was suspected of trafficking in narcotics based upon an agreement to sell one-quarter ounce of cocaine to an undercover Federal agent. The narcotics transaction was to occur upon the day of Cherry's arrest, and a search warrant had been obtained for Cherry's van.

Special Agent Snyder, around whose actions this case revolves, was not involved in the investigation into the food stamp, weapons, or narcotics violations, but was assigned to assist with execution of the warrants obtained for Cherry and his van. At a briefing on the morning chosen for the arrests of Cherry, Risk, and a number of other suspects, Snyder learned that Cherry was suspected of food stamp and narcotics trafficking, that Risk had sold firearms to an undercover agent, and that Cherry had a "serious" arrest record. He also learned that Cherry had, three days earlier, purchased food stamps at less than their face value from an undercover agent; at the time of the buy, Cherry was accompanied by an accomplice, unknown to the investigators, who actively assisted Cherry in the transaction and was present when Cherry agreed to the narcotics sale. Anticipating that Cherry might prove to be armed and dangerous, Snyder and his fellows donned protective vests before undertaking their assignment.

Although the agents began looking for Cherry in the morning, he was not found until early afternoon. At that time, he was spotted in the parking lot of a Toledo food stamp distribution center. He was not

[*] The Honorable David S. Porter, United States Senior District Judge, Southern District of Ohio, sitting by designation.

driving his van, but was seated in the driver's seat of a parked Cadillac. Appellee Wayne Bell was sitting in the front passenger seat, and a number of people were milling around the car. After a brief surveillance, the agents moved to execute the warrants. Two agents moved to the driver's side of the Cadillac and arrested Cherry without incident. While that arrest was taking place, Agent Snyder moved to the front passenger door, backed up by another agent who stood with his back to Snyder, facing the other people in the parking lot. Snyder then ordered Bell to put his hands on the dashboard of the car. Bell did not move his hands from their position on his lap or thighs (Agent Snyder testified that Bell's hands were visible from his position outside the car). Snyder repeated his command to no avail, and then ordered Bell to get out of the car. Bell unlocked the door by means of the inside door handle, but did not open it. Snyder opened the car door and extracted Bell from his seat.

The agent testified that, throughout this brief period, Bell stared back at him in a manner he characterized as "defiant." After Bell, now out of the car, did not respond to a command to place his hands on the roof of the car, Snyder turned him around and put his hands on the car. Snyder then frisked Bell and immediately encountered an object he thought was a small-caliber automatic handgun inside Bell's unzipped winter coat. Snyder held on to the object and obtained assistance in removing Bell's coat. The object proved to be an unloaded automatic pistol. Bell was not in possession of ammunition, and none was found in the car. Bell was arrested for allegedly violating a Toledo ordinance prohibiting the carrying of concealed weapons; upon the discovery that Bell had a previous felony conviction, he was indicted upon a single count of being a convicted felon in possession of a firearm in violation of 18 U.S.C. App. § 1202(a) (1976).

## II.

A hearing on the admissibility of the firearm was held before a magistrate, and Agent Snyder was the only witness called. The magistrate, in a thoughtful opinion, recommended to the district court that the gun be suppressed. The magistrage reasoned that at the time of the frisk, there was nothing which permitted the inference that Bell was armed and dangerous. Agent Snyder had agreed with defense counsel that there was "no indication that Mr. Bell had on his person a weapon until [he] actually felt it," and agreed that Bell's conduct was "passive." In the magistrate's view, while Snyder had "some reason to believe" that Bell was the unknown suspect, the only basis for the frisk was the fact that Bell was in the company of a suspect legitimately considered armed and dangerous.

The magistrate relied upon *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) for the proposition that a frisk for weapons is justified only where specific and articulable facts give a policeman reasonable grounds to believe that an individual is armed and dangerous. Noting that the Supreme Court held in *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," the magistrate concluded that the Government had not met its burden of showing the frisk to be reasonable. *See United States v. Wickizer,* 633 F.2d 900, 901 (6th Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1401, 67 L.Ed.2d 370 (1981) (government has burden of proving the reasonableness of a search once movant establishes *prima facie* case of unreasonableness). The magistrate found that

> [i]n the instant case the principal 'articulable facts' relating to the defendant which led to the frisk were a failure to respond to Agent Snyder's command to place his hands on the dashboard, and his staring at the Agent 'defiantly.' This conduct, while impolitic and unwise, does not reflect the type of hostility and nascent risk of violence which would support

a conclusion that the defendant was armed and dangerous.

*Magistrate's Report & Recommendation* at 5.[1]

Upon the government's motion, the district court reviewed the magistrate's report and recommendation, and affirmed it with certain modifications. Specifically, the district court concluded that the magistrate's report permitted the conclusion that Snyder knew of the specific nature of Cherry's arrest record prior to the execution of the warrant, an inference the district court viewed as unsupported by the record. The court also thought it noteworthy that the agent "admitted that upon viewing the defendant he did not recognize him" as the unidentified male suspect in question.[2] The court further found that while Bell did not cooperate with Snyder when ordered to get out of the Cadillac, "there is also no doubt that defendant in fact unlocked the door, allowing Agent Snyder to open it." The court concluded that "the factual case for the patdown in issue ... is even weaker than the Magistrate's Report and Recommendations suggests."

**1.** The magistrate observed that Agent Snyder acted in "good faith concern for his safety and that of his fellow officers and bystanders," and concluded that "suppression in this case is unlikely to have a deterrent effect in similar situations in the future," since officers in Agent Snyder's position are "much more likely to risk losing a case than a life." This view of the matter is noteworthy given the Supreme Court's perception that "[i]f ... the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted.'" *United States v. Leon,* — U.S. —, —, 104 S.Ct. 3405, 3514, 82 L.Ed.2d 677 (1984), *quoting United States v. Janis,* 428 U.S. 433, 454, 96 S.Ct. 3021, 3032, 49 L.Ed.2d 1046 (1976); *see also United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974); *United States v. Cotton,* 751 F.2d 1146, 1148 (10th Cir.1985).

**2.** Agent Snyder agreed with defense counsel that "he did not recognize Mr. Bell as being" the unidentified suspect. However, he disagreed with the statement that he "looked at Mr. Bell and ... could tell right away that [Bell] wasn't the guy." Thus, to the extent that the district court, reviewing a cold record, found that the agent knew that Bell was not the unknown companion at the time he approached the car, the finding is unsupported by the record.

## III.

The Government invites us to decide this case based upon language drawn from *United States v. Berryhill,* 445 F.2d 1189, 1193 (9th Cir.1971), where the court stated that "[a]ll companions of the arrestee within the immediate vicinity ... are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *Berryhill's* "automatic companion" assertion has since been cited with approval by the Fourth and Seventh circuits. *See United States v. Poms,* 484 F.2d 919, 922 (4th Cir.1973); *United States v. Simmons,* 567 F.2d 314 (7th Cir.1977). Appellant argues that these cases set forth a rule which we should adopt in the case at bar.

We decline to adopt an "automatic companion" rule, as we have serious reservations about the constitutionality of such a result under existing precedent. Review of *Berryhill, Poms,* and *Simmons* suggests that the language in those cases which the Government views as legitimizing a *Terry* frisk of any companion of an arrestee is in each case *dictum* unnecessary to the court's holding.[3]

**3.** In *Berryhill,* the court was concerned with admission of evidence seized from an individual who was not charged with a crime, and the arresting officers had a "reasonable suspicion" that the passenger's handbag contained a weapon before they searched it. 445 F.2d at 1193. Similarly, in *Simmons,* the court was concerned with what amounted to a "protective sweep," *see, e.g., United States v. Kinney,* 638 F.2d 941, 943–45 (6th Cir.), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3056, 69 L.Ed.2d 423 (1981), which included a search of "items within the area of immediate control of a person who is present during a custodial arrest" of a man who had just committed an armed robbery, 567 F.2d at 320; as in *Berryhill,* the court was not concerned with the admission of such evidence against its possessor, but rather against the original arrestee. In *Poms,* the officers had information that the defendant *"always* carried a weapon in" the very shoulder bag that they searched as the defendant was reaching inside the bag. 484 F.2d at 921 (emphasis in original).

A similar problem is presented by the Government's reliance upon *United States v. Vaughan,* 718 F.2d 332 (9th Cir.1983). There, the court suggested that after a passenger twice tried to walk away from officers who were executing a warrant upon the driver of the car and other

As to the propriety of the "automatic companion" rule, we do not believe that the *Terry* requirement of reasonable suspicion under the circumstances, 392 U.S. at 27, 88 S.Ct. at 1883, has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates. The Supreme Court has "invariably held [that] the predicate to a patdown of a person for weapons" is "a reasonable belief that he was armed and presently dangerous." *Ybarra*, 444 U.S. at 92–93, 100 S.Ct. at 342–343 (footnote and citations omitted);[4] and the Court was, in *United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 225, 92 L.Ed. 210 (1948), "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." The Government does not aver that these cases have lost their vitality, and their language and import militate against the approach the Government urges. An "automatic companion" rule is inconsistent with the Supreme Court's observation that it "has been careful to maintain [the] narrow scope" of *Terry's* exception to the warrant requirement. *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979).

### IV.

Since we do not agree with the Government that the handgun was properly seized based only upon Bell's presence in Cherry's

automobile at the time of Cherry's arrest, we turn to consideration of whether the patdown conducted by Agent Snyder passes constitutional muster under traditional Fourth Amendment analysis.

The fundamental inquiry in determining whether evidence is admissible is whether, in light of the "totality of the circumstances" surrounding the seizure, it was reasonable for law enforcement personnel to proceed as they did. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). In applying this standard to the case at bar, certain additional principles are relevant. The first is that reasonableness of a given search or seizure depends upon "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975); *see also United States v. Hensley*, 469 U.S. ——, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

The second is that the arresting officers in this case unquestionably had the authority to search the passenger compartment of the Cadillac incident to Cherry's lawful arrest under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).[5] As a corollary to the princi-

---

passengers, the officers "could ... engage in a limited *Terry* 'stop and frisk' to determine that he had no weapons that might endanger the officers" based upon Vaughan's presence in the car with individuals suspected of crimes. *Id.* at 334. Nonetheless, the court sustained suppression of evidence gained in a full search of the passenger; the language relating to *Terry* was, once again, irrelevant to the holding that the evidence should be suppressed.

4. We do not view this case as being as close to *Ybarra* as did the courts below. In that case, the Court held that patrons in a tavern were not subject to protective frisks based only upon their presence during execution of a search warrant for the premises. *Ybarra* teaches that "mere propinquity, without more," does not give rise to probable cause to search. 444 U.S. at 91, 100 S.Ct. at 342. However, not only was there

no demonstrable relationship between Ybarra and the bartender in that case, but Ybarra "made no gestures indicative of criminal conduct," *id.*, and "acted generally in a manner that was not threatening." *Id.* at 93, 100 S.Ct. at 343. We do not read *Ybarra* as holding that "mere propinquity" cannot be considered as a factor in determining the legitimacy of a frisk; rather, the case held that proximity cannot be the sole legitimizing factor. *Cf. Vaughan*, 718 F.2d at 335 n. 6 ("one would expect that persons in a ... car are there by invitation or consent").

5. The Fourth Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). "[M]ore particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States*

ples set forth in *Belton*, Agent Snyder had the authority to require defendant to exit the automobile while the arrest of Cherry and the subsequent, legitimate search of the passenger compartment of the Cadillac occurred. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977).

■ Third, while the fact of companionship did not of itself justify the frisk herein, it is not irrelevant to the mix that should be considered in determining whether the agent's actions were justified. *See United States v. Sink*, 586 F.2d 1041, 1047–48 (5th Cir.1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979) (search of passengers in arrestee's automobile justified where "searching officer can point at specific and articulable facts suggesting actual physical risk to himself or others," *id.* at 1048). Too, we think that the implication of recent cases considering searches in the context of police contacts with individuals in automobiles, *see, e.g., Michigan v. Long*, 463 U.S. 1032, 1048 and n. 13, 103 S.Ct. 3469, 3479 and n. 13, 77 L.Ed.2d 1201 (1983), is that law enforcement officers are faced with a less substantial task in justifying the limited intrusion of a patdown when its subject is seated in a car, than when approaching an individual on the street or in some other circumstance.[6]

v. *Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Because Bell was legitimately possessed of his own expectation of privacy, *Belton* and *Chimel* do not support the proposition that the search of the passenger compartment of an automobile authorized by *Belton*, 453 U.S. at 460, 101 S.Ct. at 2864, extends to passengers in a car driven by one who is being arrested pursuant to a warrant.

6. Individuals seated in a parked automobile are no less likely than those lingering in a restaurant to "'have been talking about the World Series,'" *Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968), and so there is nothing about being seated in a car which is itself suspicious. However, we recognize the "inordinate risk confronting [officers] as [they approach] a person seated in an automobile," *Pennsylvania v. Mimms*, 434 U.S. at 110, 98 S.Ct. at 333; *see also Adams v. Williams*, 407 U.S. 143, 148 and n. 3, 92 S.Ct. 1921, 1924 and n. 3, 32 L.Ed.2d 612 (1972).

## V.

■ With these principles in mind, we turn to consideration of the specific articulable facts known to Agent Snyder at the time he approached the passenger side of the Cadillac, as well as rational inferences therefrom, which might reasonably support the perception that Bell posed a risk to the security of the officers.[7] Review of the agent's testimony reveals several such factors.

First, Agent Snyder knew that he was approaching an automobile containing Earl Cherry, a man reasonably suspected of being armed and dangerous for a number of reasons: his front-line involvement in a large food stamp trafficking ring; his agreement to sell a significant quantity of cocaine on the day in question; his close association with Risk, who was known to traffic in handguns; and Cherry's prior "serious" criminal record. Each of these factors was known to Snyder as he approached the Cadillac. He testified that his general experience has been that narcotics transactions frequently involve weapons; the inference on his part that weapons might be involved in this transaction was not unreasonable, and is thus entitled to "[d]ue weight." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

7. The magistrate was persuaded that the agent did not consider Bell a security risk by the agent's testimony that he had no indication that Bell possessed a weapon until he found it upon commencing the frisk. This analysis misapprehends the problem. The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he "had an indication" that the defendant was in fact armed. *See United States v. Tharpe*, 536 F.2d 1098, 1100–01 (5th Cir.1976) ("where there was a good reason for an officer to apprehend that he was in a position of real danger from companions of an arrestee, [his] pat-down search is compatible with *Terry*"); *see also Michigan v. Long*, 463 U.S. at 1051, 103 S.Ct. at 3481 (the relevant inquiry is whether an officer perceives a situation as "potentially dangerous").

Second, as discussed above, the agent was not obliged to ignore the fact that Bell was in the company of a man known to be potentially armed and dangerous in assessing the potential risk posed by Bell himself. That is, the fact of companionship, while not itself justifying a frisk, was permissibly considered in analyzing whether there was reasonable cause to believe that Bell was potentially armed and dangerous.

Third, the agent knew that Cherry had an unidentified male companion who, while seated in Cherry's van just three days earlier, had observed and participated in an illegal food stamp transaction. At the morning briefing, the agent was provided a description of that individual as being approximately 5′ 8″ tall, and weighing approximately 150 pounds. At hearing, although not under oath, Mr. Bell advised the magistrate that he is 5′ 6″ tall, weighing 138.5 pounds. The agent testified that while he did not identify Bell as the unknown accomplice as he approached the car, he was unable to rule out the possibility that Bell was that individual. Nothing in the record contradicts that assertion by Agent Snyder, and given the difference of only two inches in height and 12 pounds in weight between Bell and the unknown accomplice, in light of the fact that both men were seated in automobiles when observed, we cannot say that reliance upon that factor was unreasonable under the circumstances.

In so holding, we emphasize that use of relative physical similarity or dissimilarity between individuals as a basis for justifying an intrusion into Fourth Amendment rights must be viewed cautiously; there will undoubtedly be cases in which such asserted reliance will strain credulity and hence be unreasonable. Here, however, the magistrate found that the arresting officers "had some reason to believe ... that the defendant was" the unidentified accomplice. While the district court apparently disagreed with that finding, we view it as supported by the record, and so conclude that, on the facts of this case, the agent's suspicion was reasonable.

Fourth, the overall circumstances surrounding the execution of the warrant in this case also contribute to our conclusion that Agent Snyder's frisk of appellee was reasonable. The Cadillac was parked in a relatively crowded parking lot, and a number of people were in the immediate vicinity of the car. Snyder was appropriately concerned with the safety of the citizens around him; he was not in a position to simply permit Bell, in view of Bell's unwillingness to cooperate, to stand aside while the arrest and search were consummated, given that the area was somewhat congested.[8]

Fifth, the "inordinate risk confronting [Snyder] as he approach[ed]" the Cadillac, *Long,* 463 U.S. at 1048, 103 S.Ct. at 3479, gives rise to the inference that Bell's failure to follow Snyder's instructions would significantly and immediately heighten the level of concern upon the part of the officer. Here, Bell elected to ignore two lawful orders given by Agent Snyder, and he complied only minimally with a third. We do not suggest that every individual who does not comply immediately with a policeman's shouted order in the context of what must have been a confused situation is demonstrating complicity in his companion's criminal behavior. We think it significant that the commands themselves were reasonable under the circumstances. But officers are compelled to make immediate judgments, and such behavior on Bell's part, combined with his challenging stare, could only increase Agent Snyder's concern

---

8. We agree with the proposition that "[a]n officer is not warranted in relying upon circumstances deemed by him suspicious" in attempting to articulate a reasonable basis for a frisk "when the means are at hand to either verify or dissipate those suspicions without risk." *United States v. Clay,* 640 F.2d 157, 161 (8th Cir.1981). No less is sufficient to carry into effect the *Terry* Court's holding that a policeman may frisk only after he "makes reasonable inquiries" of suspected individuals. 392 U.S. at 30, 88 S.Ct. at 1884. Here, however, once Bell acted in a manner sufficient to heighten the agent's suspicions, explanation could hardly have alleviated those concerns.

that Bell posed a threat to the safety of the officers and citizens in the immediate vicinity of the Cadillac.

We have identified five factors which Agent Snyder articulated regarding his ultimate concern that Bell presented an actual physical risk to himself or others in the vicinity of the Cadillac: (1) Cherry was known to be potentially armed and dangerous; (2) Bell was in the Cadillac with Cherry; (3) Bell could not be ruled out as Cherry's accomplice of the week before; (4) the car was parked in a relatively crowded place, with people milling around it; and (5) Bell refused to comply with the agent's commands while staring at him "defiantly." We conclude that the first four of these factors placed the agent in a position that, upon Bell's refusal to cooperate with three separate commands, suspicion that Bell posed a security threat was reasonable. Applying the "totality of the circumstances" test, we determine that the limited intrusion into Bell's privacy which occurred in this case did not offend the Fourth Amendment.

## VI.

Because we have concluded that Agent Snyder acted in a reasonable manner consistent with constitutional principles in frisking Bell once he emerged from the Cadillac, we reverse the judgment appealed from and remand this case to the district court with instructions that the United States be permitted to enter the handgun seized from Bell into evidence at trial unless valid objections to its admission are raised.

REVERSED AND REMANDED.