976 F.2d 734
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
T.J. THOMPSON, Defendant-Appellant.
 No. 91-1353.
 United States Court of Appeals, Sixth Circuit.
 Sept. 9, 1992.
 
 Before RALPH B. GUY, Jr. and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Defendant T.J. Thompson appeals his jury convictions on one count of conspiring to distribute cocaine and cocaine base, 21 U.S.C. § 846, and one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). We conclude that Thompson's assignments of error are without merit and we shall affirm.
 
 I.
 
 2
 In January 1979, Thompson was convicted in a Michigan state court of felonious assault and received a sentence of three years probation. This conviction arose from a police raid at Thompson's residence at 813 Stewart Street, Flint, Michigan during which Thompson fired shots at one of the officers conducting the raid.
 
 
 3
 In 1988, Flint police investigated sales of cocaine base by Thompson and his girlfriend, Melodie Ingraham, from the same Stewart Street residence. During the investigation, Flint police obtained a search warrant for the residence. Immediately prior to executing the warrant, two officers stopped in the driveway of the house and frisked Thompson, discovering cocaine on his person. After seizing the cocaine, the raid team searched the house, discovering several firearms, including a .375 Magnum handgun.
 
 
 4
 A federal grand jury investigation into the cocaine conspiracy ensued. In March 1989, when Ingraham failed to appear before the grand jury despite being subpoenaed to do so, an arrest warrant was issued for her. A federal agent and Flint officers arrested Ingraham at the Stewart Street residence. During a protective sweep of the house immediately after the arrest, the officers encountered Thompson upstairs in a bedroom with cocaine and several firearms.
 
 
 5
 A grand jury returned a superseding indictment, charging Thompson with conspiring to distribute cocaine and being a felon in possession of a firearm charge. Thompson moved to suppress the evidence discovered as a result of the search of his person in June 1988 and as a result of the search of the Stewart Street residence and his person in March 1989. The district court denied the motions.
 
 
 6
 At trial, the government introduced in evidence the cocaine and firearms that had been seized as well as additional physical evidence and the testimony of cooperating coconspirators. The testimony indicated that from 1986 through 1988, Thompson and Ingraham purchased and sold cocaine from the Stewart Street residence, and that Thompson converted cocaine powder into cocaine base. After a week-long trial, the jury found Thompson guilty on both counts.
 
 
 7
 The district court sentenced Thompson to 300 months on the conspiracy count and 120 months on the possession count, the terms to run concurrently. Thompson timely appeals his conviction.
 
 On appeal, Thompson raises three issues:
 
 8
 1. Whether the district court should have suppressed evidence discovered during the June 1988 search of Thompson's person conducted while he was outside the premises for which officers had a valid search warrant;
 
 
 9
 2. Whether the district court should have suppressed evidence discovered during the March 1989 sweep of the house in which law enforcement agents were executing a valid arrest warrant against Ingraham; and
 
 
 10
 3. Whether, at the time of his arrest, Thompson had his civil rights restored, or whether he was subject to the weapon disability of 18 U.S.C. § 922(g)?
 
 
 11
 We conclude that the district court's judgment should be affirmed.
 
 II.
 A.
 
 12
 Admissibility of Evidence Seized from Thompson in June 1988
 
 
 13
 Thompson notes that when Flint officers conducted a search of his person in June 1988, he was outside the premises for which they possessed a warrant. He argues that the circumstances did not create the level of reasonable suspicion necessary to justify a Terry pat-down search. See Terry v. Ohio, 392 U.S. 1 (1968).
 
 
 14
 We briefly relate the facts relevant to this issue. On June 13, 1988, an undercover officer purchased cocaine base at that residence from Ingraham. Later that day, officers obtained a search warrant for the Stewart Street residence, specifying that the premises to be searched was the main two-story home. At this time, the officers were aware that Thompson lived at Stewart Street, and that he had fired upon an officer during a previous raid.
 
 
 15
 Before the raid team executed the warrant, two plainclothes officers, Sergeants Colin Perry and Charles Weston, drove by the house. They observed two people in the driveway approximately 3-4 feet from the actual house, with one man standing next to the passenger side of a car parked in the driveway, and the other man sitting in the driver's seat of the car. At that point, Perry and Weston decided to secure the two men.
 
 
 16
 Perry and Weston pulled into the driveway and left their car. Perry approached the driver's side of the car and Weston approached the passenger's side. Weston identified himself and Perry as police officers. Weston then saw the driver, who he later learned was Thompson, place something underneath his right leg; Weston concluded that the driver might have been armed. Weston told Perry of this movement, which indicated to Perry that Weston thought the driver may be armed. Perry then asked the driver to exit the vehicle; at this point, Weston informed Perry that the man was Thompson. Perry conducted a pat-down search of Thompson's outer clothing. During this search, Perry felt a hard, cylindrical object in Thompson's sock. Perry testified that the object could have been a knife, gun, or some sort of weapon. Perry removed the object, which was later determined to be a tightly wrapped plastic sandwich bag containing cocaine.
 
 
 17
 The district court held that under Terry, supra, and Michigan v. Summers, 452 U.S. 692 (1981), "the Flint Police officers had a right ... to do a protective sweep based on an articulable basis for suspecting criminal activity on the premises." We agree with the district court.
 
 
 18
 This court reviews a district court's factual determination of whether officers possessed a reasonable suspicion under the clearly erroneous standard. United States v. Taylor, 956 F.2d 572, 576 (6th Cir.1992) (en banc).
 
 
 19
 In Terry, the Supreme Court held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. 392 U.S. at 30. An officer may legally search for weapons if a reasonably prudent officer in the same circumstances would be warranted in the belief that his safety, or that of others, is in danger. Id. at 27; United States v. Paulino, 935 F.2d 739, 746 (6th Cir.1991), cert. denied, 112 S.Ct. 883 (1992). The reasonableness of police conduct should be judged "in light of the particular circumstances" of the encounter. Terry, 392 U.S. at 21.
 
 
 20
 Perry's and Weston's June 1988 encounter with Thompson was both a stop and a frisk. Whether the actions of the officers were proper depends upon whether Perry and Weston had a reasonable suspicion supported by articulable facts that criminal activity may be occurring. The first part of the encounter was the "stop" of Thompson and his companion by approaching them as they stood outside the Stewart Street residence. This stop was permissible. In Michigan v. Summers, the Court held that the detention of a resident while officers executed a search warrant, although a "seizure," was permissible because the warrant provided an articulable and particularized suspicion that justified the detention. "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705.
 
 
 21
 The second part of the officers' encounter with Thompson was the frisk conducted by Sergeant Perry immediately after the stop. We think the frisk was likewise based upon reasonable suspicion. First, Perry and Weston knew that they were approaching a known place of cocaine trafficking--earlier that same day, an undercover police officer had purchased cocaine at the house. As a result, it was reasonable to believe that the two men outside the house might possess weapons. United States v. Bell, 762 F.2d 495, 500 (6th Cir.), cert. denied, 474 U.S. 853 (1985). Second, the officers knew that in a prior raid at the same residence, Thompson shot at a police officer. Third, after the initial stop, Thompson made a quick movement with his right hand, a motion that suggested to Weston that Thompson was armed. In United States v. Cochran, 939 F.2d 337 (6th Cir.1991), cert. denied, 112 S.Ct. 1166 (1992), a similar movement created sufficient reasonable suspicion for the police, after they stopped the defendant's car, to conduct a limited search of the passenger compartment of the car. Id. at 338. Fourth, Perry testified that the object that he discovered, the cylindrical-shaped package of cocaine, "could have been a knife; it could have been a gun, could have been some sort of weapon."
 
 
 22
 The district court found that the officers possessed the requisite reasonable suspicion, and this finding was not clearly erroneous. The fruit of the frisk of Thompson--the package of cocaine--was admissible and the district court correctly decided not to suppress it.
 
 B.
 
 23
 Admissibility of Evidence Seized in March 1989 Protective Sweep
 
 
 24
 Thompson notes that the officers, pursuant to a valid arrest warrant, arrested Ingraham on the first floor of the Stewart Street residence. Thompson argues that after the officers seized Ingraham they lacked any reasonable suspicion to search upstairs for Thompson.
 
 
 25
 We briefly outline the facts relevant to this issue. On March 9, 1989, Drug Enforcement Administration Special Agent William Dodson, accompanied by Sergeant Perry and Lieutenant Jerome Koger of the Flint Police, went to the Stewart Street residence to execute the arrest warrant on Ingraham. When they arrived at Stewart Street, Ingraham answered the door. Perry asked if Thompson was home, and Ingraham replied that he was upstairs and had some cocaine on him. Dodson and Perry proceeded upstairs and discovered Thompson sitting on a bed. Near the bed there was a safe, on top of which was a triple beam scale with white powder on one of the plates. Thompson brushed the powder off the scale and attempted to push something down into his front pants pocket. The officers seized the object, which was a plastic sandwich bag containing cocaine. The officers also discovered two loaded handguns, a .22 caliber revolver and .357 Magnum revolver, on a shelf that was part of the headboard of the bed on which Thompson was sitting. In a closet, the officers discovered a loaded Marlin .30/.30 caliber rifle.
 
 
 26
 The district court found that the officers who arrested Ingraham conducted a lawful protective sweep of the premises that resulted in their discovery of Thompson, the firearms, and the cocaine. Again, we agree with the district court.
 
 
 27
 In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court addressed the requirements that law enforcement officers must meet before conducting a protective sweep of a house in conjunction with an arrest. The Court held:
 
 
 28
 [A]s an incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.
 
 
 29
 Id. at 334.
 
 
 30
 In this case, when Agent Dodson and the Flint officers went upstairs, they clearly extended their search beyond those "spaces immediately adjoining the place of arrest." It was necessary, therefore, that the officers know of "articulable facts" which warranted a "reasonably prudent" belief that the upstairs harbored a dangerous individual. We conclude that there were such facts, the officers were aware of them, and that a protective sweep of the upstairs portion of the Stewart Street residence was warranted.
 
 
 31
 Ingraham told the officers that Thompson was upstairs and in possession of cocaine. The officers also knew that Thompson had, in the past, proven himself dangerous to police officers. Finally, the officers knew that Thompson was involved in cocaine trafficking. Given these facts, a protective sweep of the upstairs was permissible.
 
 
 32
 Once upstairs, the scale, the powder on the scale, and two firearms were in plain view and thus could be lawfully seized. United States v. Rigsby, 943 F.2d 631, 637 (6th Cir.1991), cert. denied, 112 S.Ct. 1269 (1992). The observation of these items and of Thompson trying to hide something in his pants pocket then gave the officers the requisite reasonable suspicion to conduct a limited search of Thompson, which revealed a package of cocaine.
 
 
 33
 We hold that the fruits of the March 1989 protective sweep were admissible, and the district court did not err when it decided not to suppress them.
 
 C.
 Thompson's Status as Felon
 
 34
 Thompson argues that his 1979 felony conviction does not subject him to the federal weapons disability statute because his civil rights were restored to him under Michigan law when his probation ended in 1982.
 
 
 35
 18 U.S.C. § 922(g)(1) provides, in relevant part:
 
 
 36
 It shall be unlawful for any person--
 
 
 37
 (1) who has been convicted in any court of crime punishable by imprisonment for a term exceeding one year....
 
 
 38
 ....
 
 
 39
 ... [to] possess in or affecting commerce, any firearm or ammunition
 
 
 40
 ....
 
 
 41
 The statute also defines the term "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 921(a)(20) provides:
 
 
 42
 What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for the purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms.
 
 
 43
 We must look to Michigan law to determine whether Thompson's civil rights have been restored.
 
 
 44
 In a very recent decision, this court, in United States v. Driscoll, No. 91-1583, 1992 U.S.App. LEXIS 5863 (6th Cir. July 16, 1992), held that as a result of the Michigan Court Rules relating to jury service, a convicted felon may not serve on a jury, and thus does not have his civil rights restored. The court noted:
 
 
 45
 Thus, we cannot conclude that Michigan has restored [defendant's] rights to serve on a jury. As we read Michigan law, he would be automatically dismissed from jury service once either party brought his former conviction to the attention of the court in either a civil or criminal case. Furthermore, in a criminal case, Michigan court rules recommend that the trial court dismiss convicted felons on its on [sic] motion. While the trial court generally must decide whether the challenged person falls within a certain category, such a determination is not needed for convicted felons.
 
 
 46
 Id., slip. op. at 12. Therefore, a person convicted of a felony in Michigan, and placed on probation, may still be prosecuted for violations of section 922(g)(1) even after his probation ends. Id. at 13.
 
 
 47
 In this case, Thompson, was convicted of a felony in Michigan in 1979. He may not, therefore, serve on a jury in Michigan; thus he has not had his civil rights restored, and he is subject to prosecution under section 922(g).
 
 III.
 
 48
 For the foregoing reasons, we AFFIRM the judgment of the district court.