### UNITED STATES of America

v.

### Reginald SAWYERS.

No. 3:98–00087.

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 18, 1999.

---

Lawrence W. Moon, Office of The United States Attorney, Nashville, TN, for U.S.

Sumter L. Camp, Jr., Federal Public Defender's Office, Nashville, TN, for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Pending before the Court is Defendant's Motion to Suppress, (Doc. No. 19), to which the government has responded, (Docs. No. 28, 30, 36). A hearing was held on this matter on June 16, 1999. For the reasons set forth below, Defendant's Motion is GRANTED.

## I. Background

Defendant Reginald E. Sawyers has been charged with unlawful possession of a firearm in violation of 26 U.S.C. § 5861(d). (Doc. No. 1.) The charge arises from events that transpired on March 11, 1998. On that date, Metro Police Department Officers James Lane and Lewis Lawrence received an anonymous tip from a person unknown to them that there was a possible drug-related transaction in progress at 180 Wallace Road, Apartment F–6, in Nashville, Tennessee. (Doc. No. 35 at 2; Tr. at 17.)[1] Upon arriving at 180 Wallace Road, the officers found approximately ten people in the apartment. (Tr. at 7.) The officers obtained consent to search the apartment from the resident of the apartment, James Angus, and obtained the consent of all ten individuals present to frisk their persons as well. (Doc. No. 35 at 2; Tr. at 7–8.) Defendant was not among the ten individuals present at the apartment when the officers arrived, but arrived approximately one hour later. (Tr. at 8.)

During the time in which the officers were searching Mr. Angus' apartment and before Defendant arrived on the scene, other people arrived at the apartment. (Tr. at 9.) Officer Lane greeted each of these individuals as they arrived at the door. Each time that he opened the door for Mr. Angus' guests, Officer Lane would remove his police raid vest so that he bore no sign of being a police officer but rather appeared to be dressed as a civilian. (Tr. at 10.) Officer Lawrence, however, remained in the background with his police raid vest on and with his weapon drawn "in a low ready position." (Tr. at 11, 38.)

After greeting each person at the door, Officer Lane identified himself as a police

---

1. The transcript of the suppression hearing held on June 16, 1999, (Doc. No. 32), will be cited herein as "Tr."

officer and asked each one if he could frisk them. (Tr. at 9–10.) All of these people consented to be frisked, and remained in the apartment while the officers conducted their search, eating and talking among themselves. (Tr. at 7–9, 29.) Indeed, Officer Lane testified that the gathering at the apartment "[l]ooked like just a bunch of friends hanging out." (Tr. at 9.) Ultimately, the officers failed to find any drugs or contraband in the apartment or on those individuals present at the apartment during this time. (Tr. at 8.)

Almost an hour passed between the time in which the officers first arrived at 180 Wallace Road and the time in which Defendant knocked on Mr. Angus' door. (Tr. at 8.) At that point, the officers were "wrapping up" the search. (Tr. at 20.) When Defendant arrived, Officer Lane greeted him at the door. Officer Lawrence, who was standing directly in back of Officer Lane, still had on his police raid vest, and his gun was drawn. (Tr. at 12, 38; Gov't. Ex. 1.) After Defendant had entered the apartment, both officers identified themselves as police officers. (Tr. at 12.) Upon hearing this, Officer Lane testified that Defendant stopped and looked around the room, as if in "awe." (Tr. at 12, 27.) The officers then asked Defendant, who had his hands in the pockets of a long, three-quarter length leather coat that he was wearing, to remove his hands from his pockets.[2] (Tr. at 14, 26–27, 40.)

Officer Lane testified that, in response to their request that he remove his hands from his pockets, Defendant asked the officers why he should do so, and allegedly made what Officer Lane described as "fidgety" motions with his hands and arms. (Tr. at 12–13, 27.) Similarly, Officer Lawrence testified that he recalled Defendant making a "kind of back and forth" motion with his hands. (Tr. at 43.)

The officers' testimony with respect to Defendant's hand motions, however, was disputed at the hearing. Specifically, on cross examination, Defendant's counsel established that Officer Lawrence's report, which was filed and written close to the time of Defendant's arrest, failed to mention that Defendant moved his hands in any way when he was asked to remove his hands from his pockets. (Tr. at 44.) Indeed, according to Officer Lawrence's report, Defendant only asked "why" in response to the officer's request that he remove his hands from his pockets. (Id.) Furthermore, according to the report, before Defendant could take his hands out of his pockets, and after he had asked Officer Lane why he should do so, Officer Lane then told Defendant to "keep his hand[s] in his pocket[s]." (Tr. at 27, 44; Doc. No. 25, Ex. 1 at 1.)

According to Officer Lane, "[i]f someone doesn't take their hands out of their pockets immediately, that kind of sparks ... [an officer's] safety factor." (Tr. at 13.) In such situations, Officer Lane testified that

> one of the methods ... [officers] use for ... [their] safety [when conducting searches for drugs includes placing their] ... hands upon th[e] subject's hand and ask[ing] them to leave their hands in their pocket, and [to] put ... [their] hands on that subject's hand while they're in the pockets to hold it so that they couldn't pull anything out on ... [them], for ... [their] safety.

(Tr. at 13.)

Immediately after Officer Lane told Defendant to keep his hands in his pockets, Officer Lane reached over and grabbed Defendant's arm. (Tr. at 28). Upon touching Defendant's arm, Officer Lane felt something hard. (Id.) Officer Lane testified that this "startled" him. (Tr. at 14.) He then slid his hand up Defendant's arm, and realized that Defendant was armed. (Tr. at 28, 44.) After removing a sawed-off, 20 gauge Winchester shotgun from Defendant's sleeve, the officers

---

**2.** Officer Lane testified that it was cold on March 11, 1998 and that there was nothing unusual about Defendant's dress on that day. (Tr. at 14.)

placed Defendant under arrest.[3] (Tr. at 44; Doc. No. 25, Ex. 1 at 1–2.)

On July 15, 1998, the grand jury indicted Defendant, charging him with one count of unlawful possession of a firearm in violation of 26 U.S.C. § 5861(d). (Doc. No. 1.) On April 7, 1999, Defendant filed a Motion to Suppress the firearm, arguing that it was seized in violation of the Fourth Amendment to the United States Constitution.[4] (Doc. No. 19.) For the reasons set forth below, the Court agrees with Defendant, and grants the Motion to Suppress.

## II. Legal Standard

The Fourth Amendment protects citizens against unreasonable searches and seizures and provides that "no [arrest or search] Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. However, there are certain "narrowly drawn exception[s] to the probable cause requirement of the Fourth Amendment." *United States v. Richardson,* 949 F.2d 851, 856 (6th Cir.1991) (internal citations omitted); *see also Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), established the authority of police officers to stop and frisk a suspect for weapons when they believe that the individual may be armed and dangerous, regardless of whether the officers have probable cause to arrest. Under *Terry,* "[t]he officer need not be absolutely certain that the individual is armed" before conducting a pat-down for weapons. *Id.* at 27, 88 S.Ct. 1868. Instead, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

"The legality of a stop or frisk is evaluated under the totality of the circumstances, and ... [courts] will look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." *United States v. Smart,* 98 F.3d 1379, 1384 (D.C.Cir.1996) (internal citations omitted); *see also United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (holding in part that legality of stop and frisk should be evaluated under all circumstances). Thus, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *see also United States v. Bell,* 762 F.2d 495, 499 (6th Cir.1985) (holding that the "predicate to a patdown of a person for weapons is a reasonable belief" under the circumstances that the person is "armed and presently dangerous").

Applying the principles set forth in *Terry* and its progeny, courts have held that "[f]actors that may justify ... a search for weapons include the time of day [when the search is conducted], the 'high crime' nature of the area, an informant's tips that persons might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action." *United States v. Laing,* 889 F.2d 281, 286 (D.C.Cir.1989) (holding that reasonable suspicion justified search where officers observed suspect shove his hand in his pants pocket and begin to run towards the apartment where officers had reason to believe that cocaine was being sold and that occupants were armed and danger-

---

**3.** Officers Lane and Lawrence failed to find any additional contraband such as weapons, drugs, or shotgun shells when they later searched Defendant's car. (Tr. at 29.)

**4.** A hearing was held on this matter on June 16, 1999, after which the Court ordered both

parties to file post-hearing briefs within 10 days after receipt of the hearing transcript. (*See* Doc. No. 31.) However, Defendant's brief was filed on October 14, 1999, and, as of this date, the Court has not received the government's post-hearing brief.

ous). In addition, courts have found that a protective search may be justified where officers observe a suspicious bulge under a suspect's clothing, *see United States v. Baker*, 78 F.3d 135, 137 (4th Cir.1996), or where officers have reason to believe suspects may be engaging in drug transactions. *See United States v. Smart*, 98 F.3d 1379, 1385 (D.C.Cir.1996) (finding that where officer observed suspect engaging in what he believed to be a drug transaction, it was reasonable for the officer to suspect that the defendant "had a gun to protect himself and his drugs"). However, the "mere propinquity" of an individual to a person or premises that are subject to a search warrant does not, without more, "give rise to probable cause to search" that individual for weapons. *United States v. Bell*, 762 F.2d 495, 499 n. 4 (6th Cir.1985) (declining to adopt the "automatic companion rule," which allows police to search all companions of an arrestee to ensure that none are armed and dangerous) (*citing Ybarra v. Illinois*, 444 U.S. 85, 90, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding in part that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person")).

### III. Discussion

In this case, the government argues that Officer Lane's initial seizure and subsequent patdown of Defendant was legal because Defendant, after being ordered to remove his hands from his pockets, made "fidgety" movements that led the officers to believe, (Tr. at 12), based upon their extensive drug enforcement experience, that Defendant was trying to *"hide or keep one hand on a weapon."* (Doc. No. 28 at 2) (emphasis in original). The government also suggests that the search should be upheld because Defendant voluntarily entered the apartment at 180 Wallace Road

at the invitation of a plainclothes officer. (*See* Docs. No. 28, 30, 36.) The government argues that together, these facts caused Officers Lane and Lawrence to reasonably suspect Defendant was armed and dangerous. These arguments, however, are not persuasive.

### A. Defendant's Hand Movements

■ With respect to the argument that Defendant's "fidgety" hand movements reasonably led the officers to believe that Defendant was armed and dangerous, the Court initially notes that it is unclear from the record whether Defendant did in fact make such movements with his hands. Specifically, Defendant arrived at the door and entered the apartment with his hands in his pockets.[5] (Tr. at 14.) Before Defendant could take his hands out of his pockets, and after he asked Officer Lane why he should do so, Officer Lane immediately told Defendant to "keep his hand in his pocket." (Tr. at 27, 44.) Although both officers testified that Defendant moved his hands, Officer Lawrence's report documenting Defendant's arrest and the circumstances preceding the arrest fails to mention of any movement of Defendant's hands. (Tr. at 44; Doc. No. 25, Ex. No. 1 at 1.) These facts suggest either that Defendant (i) did not actually move his hands, or (ii) if he did move his hands, such movement was not furtive or secretive but was instead a direct response to Officer Lane's conflicting orders.

After careful evaluation of all the evidence presented, the Court finds the officers' testimony with respect to Defendant's hand movements to be incredible. As such, the Court finds that Defendant did not move his hands in a fidgety or furtive manner after Officer Lane requested that he remove his hands from his pockets.

---

5. In this regard, it should be noted there was nothing unusual about the fact that Defendant may have arrived at the apartment with his hands in his pockets. As the officers testified, it was cold on March 11, 1998, and Defendant's coat was well-suited to the weather. (Tr. at 14.)

Furthermore, even if Defendant did make fidgety or furtive gestures with his hands, it is unclear that Officers Lane and Lawrence recognized these gestures to be threatening. Specifically, had the officers thought Defendant was attempting to *"hide or keep one hand on a weapon"* as the government contends, (Doc. No. 28 at 2) (emphasis in original), it is reasonable to assume that Officer Lane would have followed protocol and placed his

> hands upon th[e] subject's hand[s] and ask[ed] ... [him] to leave ... [his] hands in ... [his] pocket[s], and [to] put ... [his] hands on ... [Defendant's] hand[s] while they're in the pockets to hold ... [them] so that ... [Defendant] couldn't pull anything out on ... [the officers], for ... [the officers'] safety.

(Tr. at 13.) However, instead of placing his hands upon Defendant's hand, Officer Lane placed his hand upon Defendant's arm. (Tr. at 14; Doc. No. 25, Ex. No. 1, at 1.) Officer Lane also testified that it was not until he placed his hand on Defendant's arm that he realized Defendant was concealing something, and that he did not discover that it was a gun until he ran his hand up Defendant's arm. (Tr. at 14; Doc. No. 25, Ex. No. 1, at 1–2.) Indeed, he stated that he was "startled" to feel a hard object underneath Defendant's jacket. (Tr. at 14.) Accordingly, the Court finds that Officer Lane's failure to follow the established procedures for securing a suspect's hand reveals that he did not believe Defendant was attempting to conceal a gun in his pocket, and therefore did not believe Defendant to be armed and dangerous at the point when he placed his hand upon Defendant's arm. As such, Officer Lane lacked the necessary reasonable suspicion upon which to base the seizure and subsequent search of Defendant.

■ However, even assuming that Defendant did move his hands in a fidgety or furtive manner, furtive movements of the hands *alone* fail to justify a warrantless seizure and search. *See, e.g. United States v. Clay*, 640 F.2d 157, 158 (8th Cir.1981)

(declining to uphold search where defendant, who did not live at apartment where search was being conducted, hesitated and took a step backwards when invited into apartment by police officer, in part because defendant did not also "turn around," run away, make "furtive gestures," or otherwise "inexplicable, sudden movements toward a pocket or other place where a weapon could be concealed"). Instead, furtive movements of the hands and arms may be one of several "specific and articulable facts" that, under all of the circumstances of a particular case, may cause an officer to reasonably suspect that a person is armed and dangerous. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868; *see, e.g., Laing, supra; United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir.1997) (finding that defendant's furtive hand movements, refusal to obey orders, attempt to exit vehicle when stopped by police, and the fact that the defendant leaned back and appeared to shove something down toward his waist constituted reasonable suspicion); *United States v. McNeal*, 955 F.2d 1067, 1077 (6th Cir.1992) (holding that tip from a reliable informant concerning defendant's dangerous reputation and drug trafficking activities, defendant's efforts to conceal himself after police entered the apartment, and the fact that defendant was holding a bag in one hand while reaching for his armpit with his other hand caused police to reasonably suspect defendant was armed and dangerous, thereby justifying search of defendant); *United States v. Smart*, 98 F.3d 1379, 1384–85 (D.C.Cir.1996) (holding that officer's observation of suspect engaged in probable drug transaction, suspect's refusal to raise hands when ordered, and suspect's movement of hands to waistband reasonably led officer to believe suspect was armed, thereby justifying search of suspect); *United States v. Clapp*, 1999 WL 359436, at *3 (4th Cir.1999) (unpublished table decision) (finding reasonable suspicion existed to justify search where defendant moved his hands in and out of his pockets, turned away from the officers, and where officer observed a suspicious

bulge under defendant's clothing). Thus, in order to justify the search, the government must demonstrate additional facts upon which the Court could find that the officers entertained a reasonable suspicion that Defendant was armed and dangerous.

### B. Totality of the Circumstances

█ The government argues that Defendant voluntarily entered the apartment at 180 Wallace Road during the time in which it was being searched for drugs, and submits that this fact should enter the reasonable suspicion calculus. In support of this argument, the government relies upon *United States v. Patterson*, 885 F.2d 483 (8th Cir.1989). (*See generally* Docs. No. 28, 30, 36.) As detailed below, however, Defendant's voluntary entrance into Apartment F–6 is irrelevant to the Court's determination of whether the officers entertained a reasonable suspicion that Defendant was armed and dangerous, and thus the government's reliance on *Patterson* is misplaced.

In *Patterson*, the defendant arrived at a residence where police were conducting a search pursuant to a warrant, driving the resident's van. 885 F.2d at 484. The residence was not the defendant's residence, but instead was the residence of an individual whom the police suspected of criminal activity. *Id.* When the defendant came to the front door, he was asked to come inside by a plainclothes police officer, who informed the defendant that a search was in progress pursuant to a warrant. When asked by the police officers what he was doing at the residence, the defendant told the officers a story they did not believe. The defendant was then subjected to a patdown search, and the police found a firearm in the pocket of his jacket. *Id.*

Ultimately, the Eighth Circuit upheld the constitutionality of the search. In so doing, the Court noted that the police had discovered drugs and other evidence of an ongoing narcotics operation before the defendant's arrival at the residence. *Id.* The *Patterson* Court also relied upon the fact that the defendant was driving the resident's van and that he had voluntarily entered a residence housing a drug operation at the invitation of a plainclothes officer to uphold the search. *Id.* at 485. Together, the Court held that these circumstances presented the officers with "sufficient facts to be concerned about ... [their] safety." *Id.* at 485.

This case, however, is distinguishable from *Patterson*. Close reading of *Patterson* suggests that the Eighth Circuit found the defendant's voluntary entrance into the residence to be relevant only because the police had found evidence of a drug trafficking operation in the apartment prior to the defendant's arrival. Stating that "[t]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious," the Court concluded that the defendant's voluntary entrance into the residence suggested that the defendant was armed because he knew about or was a party to the drug activity within the residence. *Id.*

By contrast in this case, at the time Defendant arrived at 180 Wallace Road, the officers had established that Apartment F–6 was not a place in which drug trafficking was taking place. Both officers testified that they had failed to uncover any evidence of drugs or contraband in the apartment after an hour of searching the apartment. (Tr. at 8, 9, 29). Of the many people present in the apartment when Defendant arrived, all consented to be searched and not one had any drugs, weapons or contraband concealed on their persons. (*Id.*) Moreover, the testimony in this case fails to establish that the apartment at 180 Wallace Road was a location known to the officers as one in which drug trafficking regularly occurred, or that the officers had had any prior contact with Defendant or any of the other persons present in Apartment F–6 or knew those persons to be dangerous, thereby supporting the conclusion that Defendant may have known of or been a part of such

illegal activity. To the contrary, all evidence in the record supports the conclusion that Defendant's voluntary entrance into Apartment F–6 was neither unusual nor threatening under the circumstances. Officer Lane testified that the gathering resembled a "bunch of friends just hanging out," and that people were eating and talking throughout the duration of the search.[6] (Tr. at 9, 29.) Based upon these facts, the possibility that the officers were actually in danger was significantly reduced, and Defendant's voluntary entrance into Apartment F–6 could not have caused the officers to reasonably fear for their safety. *See United States v. Reid,* 997 F.2d 1576, 1579 (D.C.Cir.1993) (acknowledging that a person's proximity to drug activity is a factor which contributes significantly to an officer's reasonable belief that a person is armed and dangerous). Accordingly, the Court finds Defendant's voluntary entrance into Apartment F–6 and *Patterson* inapplicable to the instant case.[7]

In this case, there is only one additional fact, other than the alleged hand movements, upon which the Court believes the officers could have based a reasonable suspicion that Defendant was armed and dangerous. Specifically, when the officers asked him to remove his hands from his pockets, Defendant asked why he should do so. (Tr. at 27–28.) In some cases, hesitancy to follow an officer's order, coupled with "furtive gestures" or movements

and other suspicious circumstances, could cause an officer to reasonably suspect that a suspect may be armed and dangerous. *See Clay,* 640 F.2d at 158; *United States v. Rembert,* 838 F.Supp. 1336, 1339–40 (D.Minn.1993) (following *Clay* ).

Although Defendant's response could be considered hesitant, the Court instead finds that it was defiant in nature.[8] However, even if the Court were to find that Defendant's reaction was hesitant, and that he moved his hands in a fidgety or furtive manner, the Court finds these two facts alone provide an insufficient basis upon which to find the officers entertained a reasonable suspicion that Defendant was armed and dangerous. In this regard, the Court notes that the officers failed to find drugs, guns or contraband on the premises, and had no reason to believe that anyone present at the apartment or approaching the apartment would be armed and dangerous. *See Bell,* 762 F.2d at 499 (holding that, although a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person, the fact of companionship is relevant to the mix of facts that an officer and a court should consider when determining whether reasonable suspicion exists to justify a search of that person). Furthermore, Defendant was not linked in any way to any evidence of any crime, *see*

---

**6.** In support of this conclusion, the Court notes that Defendant, upon learning that the officers were conducting a search for narcotics in Apartment F–6, appeared to Officer Lane to be "awe[d]" or surprised. (Tr. at 12, 27.) Such a reaction would be consistent with the reaction of someone who expected to "hang out" with his friends, but instead discovered, upon arriving at the location where his friends were gathering, that the police were conducting a search for narcotics.

**7.** The government suggests that "the fact that drugs were not found in the consensual search does not affect the analysis of the issues here." (Doc. No. 28 at 5.) Although it is true that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to

probable cause to search that person," *Ybarra v. Illinois,* 444 U.S. 85, 90, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), it is also true that "the fact of companionship" is relevant "to the mix that should be considered in determining whether" an officer's "actions were justified." *United States v. Bell,* 762 F.2d 495, 499 (6th Cir.1985). Applying these principles, it is appropriate to consider the fact that drugs were not found in the apartment or on those present in the apartment in determining whether Officer Lane's actions were justified in this case. Accordingly, the Court rejects the government's suggestion that the Court should not consider the absence of drugs relevant in conducting its analysis.

**8.** Although the government does not make this argument, the Court considers it.

*Rembert, supra,* and was not known to the officers before his arrest to be involved in criminal activity. (Tr. at 18, 25.) *See McNeal,* 955 F.2d at 1077 (citing officers' information regarding the defendant's past dangerous acts and propensity to be armed as two of many facts supporting inference of reasonable suspicion that the defendant was armed and dangerous). Thus, even assuming Defendant moved his hands in a furtive or fidgety manner and that Defendant's response to Officer Lane's order was hesitant, the totality of the circumstances analysis would still fail to support a finding of reasonable suspicion in this case.

In conclusion, the Court finds that the officers' seizure and subsequent search of Defendant in this case was based only upon Defendant's failure to immediately remove his hands from his pockets and the mere suspicion that anyone who may have arrived at the door of Apartment F–6 could have been armed and dangerous because the officers had received a tip that the individuals at the apartment were engaged in drug trafficking. Defendant's reaction and the officers' suspicions alone fail to give rise to reasonable suspicion as a matter of law. *See, e.g., Ybarra, Clay,* and *Bell, supra.* The officers' suspicions that Defendant may have been armed and dangerous were also unfounded. This is not a case where Defendant was observed by the officers to be engaging in a drug transaction, *see Smart, supra,* or where Defendant fled upon discovering that the officers were conducting a search in Apartment F–6, *see Laing, supra.* Nor is this a case where officers observed a suspicious bulge in Defendant's overcoat, *see Baker, supra,* or even where Defendant was observed putting his hands into his pockets as if he wanted to conceal something therein, *see Smart, supra.* Instead, this is a case where Defendant entered the premises voluntarily when asked to enter by a plainclothes officer, may have made motions with his hands in response to conflicting orders of the officer, and asked why he should remove his hands from his pockets

when asked to do so by the officer. Moreover, this is a case where the officers, at the time they seized and searched Defendant, had no reason to believe that anyone in the apartment or arriving at the apartment was engaged in drug activity. Circumstances such as these are not the kind which would reasonably lead an officer to conclude that a suspect was armed and dangerous. Accordingly, the shotgun seized from Defendant on March 11, 1998 was seized in violation of the Fourth Amendment.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Suppress the shotgun is hereby GRANTED.

An Order consistent with this Memorandum shall be filed contemporaneously.

### *ORDER*

Pending before the Court is Defendant's Motion to Suppress, (Doc. No. 19), to which the government has responded, (Docs. No. 28, 30, 36). A hearing was held on this matter on June 16, 1999. For the reasons set in the contemporaneously filed Memorandum, Defendant's Motion is GRANTED.

It is so ORDERED.