RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee*,

   *v.*

DUANE GARY UNDERWOOD, II,

       *Defendant-Appellant*.

No. 23-1667

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00181-4—Robert J. Jonker, District Judge.

Argued:  December 12, 2024

Decided and Filed:  February 26, 2025

Before:  GRIFFIN, STRANCH, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Mary Chartier, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant.  Timothy P. VerHey, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Mary Chartier, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant.  Timothy P. VerHey, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

JANE B. STRANCH, Circuit Judge.  Duane Gary Underwood, II appeals his criminal conviction for possession with intent to distribute 50 grams or more of methamphetamine,

possession with intent to distribute 5 grams or more of methamphetamine, possession of a stolen firearm, and possession of a firearm in furtherance of a drug trafficking crime. Underwood raises ten issues on appeal: (1) whether 18 U.S.C. § 924(c)(1)(A) is unconstitutional, (2) whether the officers who detained Underwood lacked reasonable suspicion to do so, (3) whether Underwood was unreasonably searched, (4) whether a search warrant for Underwood's phone was invalid, (5) whether the trial court improperly admitted a set of photos and text messages under Federal Rule of Evidence 404(b), (6) whether the court erred in disallowing inquiry into potential Rule 404(b) evidence during voir dire, (7) whether the evidence was insufficient to support Underwood's convictions, (8) whether the district court abused its discretion in allowing portions of grand jury testimony to be read into the record pursuant to Rule 803(5), (9) whether the jury instructions were improper, and (10) whether Underwood's conviction should be overturned because the Government attorney was unlicensed. For the reasons that follow, we **AFFIRM**.

## I. BACKGROUND

### A. Factual Background

In July 2019, Marcus VanPelt stole his girlfriend's pink 9mm handgun. She told VanPelt's stepfather, William Chatman, that she believed VanPelt had taken the gun. Shortly thereafter, Chatman, with whom VanPelt lived, saw a pink gun in the home and became concerned about the safety of his household. He saw VanPelt outside the house on the 100 block of East Maple Street, engaging in what looked like a gun sale with individuals in a Jeep Compass. He reported all of this to the police. The police were already aware that VanPelt had gang affiliations.

Four officers of the Kalamazoo Department of Public Safety reported to the 100 block of East Maple Street, where they observed a Jeep Compass and saw Underwood walk over to the Jeep, open the rear door, and do something behind the driver's seat. Shortly thereafter, VanPelt approached the Jeep, and, subsequently, both VanPelt and Underwood walked away from the car together; VanPelt was seen displaying a large handful of cash. Two officers approached VanPelt and Underwood and stopped both men. Other officers approached the Jeep.

The officer who stopped Underwood, Officer Boglitsch, saw a large bulge in Underwood's front pocket which he feared might be a weapon, so he handcuffed Underwood, had Underwood sit on the ground, and began a pat down. It was necessary to pause, however, when the officers who were searching the Jeep reported that they had found three men inside. To protect himself and his fellow officers in the evolving situation where potentially armed men outnumbered police, Officer Boglitsch stopped patting down Underwood and observed the scene with his weapon drawn while the officer, who had initially detained VanPelt, joined the officers at the Jeep.

The officers searching the Jeep found several guns, so Officer Boglitsch was concerned that Underwood too might be armed. As soon as the officers at the Jeep had secured all three men inside, he resumed his pat down of Underwood. He did not find a firearm. But in Underwood's back pocket, he felt what he recognized as a package of drugs. He searched the pocket and confirmed that what he had felt was indeed a package of drugs. When tested, this package contained 14 grams of methamphetamine. Officer Boglitsch then placed Underwood under arrest and conducted a thorough search incident to the arrest, recovering the drugs, a cell phone, and approximately $2,400 in cash.

The three men in the Jeep were Joe Jones, Sarral Shears, and Treshawn Bible. As the officers were approaching the Jeep, they saw Jones place something underneath the vehicle. Officers searched underneath the vehicle and found the pink 9mm gun. Bible had a gun, a small bag of methamphetamine, and a digital scale on the dashboard in front of him. Behind the front seat (where the officers had seen Underwood doing something) there was a backpack with a digital scale and a bag containing 86 grams of methamphetamine. After Underwood's arrest, he was Mirandized and gave a statement in the back of a police car in which he admitted to selling "ice"—the street name for methamphetamine.

Officer Greg Day applied for and received a warrant to search Underwood's phone. In the application for the search warrant, he averred that officers had received an anonymous tip about VanPelt's sale of the pink gun at the Jeep Compass, that they had seen Underwood standing with VanPelt, that they had recovered firearms including the pink handgun, that Underwood had methamphetamine in his pocket, that there was more methamphetamine in the

Jeep than one would expect for personal use, that none of the Jeep passengers had paraphernalia for personal use of the methamphetamine, that firearms are commonly used to protect drug sales, that cell phones are generally used to facilitate drugs sales and often contain relevant evidence of those sales, and that the phone the officers requested to search was recovered from Underwood at the scene. As a result of that search, officers recovered text messages from Underwood's phone in which he discussed drug dealing and a series of pictures of Underwood posing with large amounts of cash, and, in one case, a gun.

**B. Procedural History**

Underwood was charged with possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 841 and 18 U.S.C. § 2 for the drugs found in the backpack, possession with intent to distribute 5 grams or more of methamphetamine under 21 U.S.C. § 841 for the drugs found in his pocket, possession of a stolen firearm under 18 U.S.C. § 922 and 18 U.S.C. § 924(a) for the pink gun, and possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c).

Shortly after he was charged, Underwood jumped bail and was a fugitive for two years between October 2019 and December 2021. During that window, Shears, Bible, and Jones went to trial. In a joint trial, Shears was acquitted, and Bible and Jones were convicted of firearms possession charges. Underwood was eventually arrested on a warrant, and pretrial proceedings in his case resumed.

1. <u>Pretrial Motions</u>

Underwood filed multiple pretrial motions. He moved to suppress the fruits of the search of his person arguing, as he does here, that the officer who initially approached him lacked reasonable suspicion to do so, and that the manner in which he was patted down was inappropriate. He moved to suppress the fruits of the search warrant, arguing that it had been improperly issued. He also moved to dismiss his § 924(c) charge, arguing that § 924(c) is unconstitutional. The trial court denied the motion to dismiss and denied the motions to suppress after an evidentiary hearing on September 13, 2022.

Prior to trial, the Government gave notice of two sets of evidence that became the subject of pretrial litigation.  First, the Government gave notice that it intended to admit evidence recovered from Underwood's phone including a series of text messages in Government Exhibits 26-29 that were sent in June and July 2019 and used various codes to refer to selling methamphetamine, including sales on Maple Street, and a set of photos that showed Underwood posing with large amounts of cash and a gun.  Underwood objected to the admission of this evidence under Rule 404(b), but the district court admitted the evidence.

Second, the Government advised the court in June 2022 that, when Chatman had been served with a trial subpoena, he indicated his intention to testify that he did not remember what he saw or heard on the day of Underwood's arrest.  The Government stated its intention to use Chatman's July 2019 sworn testimony to the grand jury to refresh his recollection and, barring that, to read the testimony into the record pursuant to Rule 803(5).  Underwood once again objected.  The court admitted the evidence.

2. Voir Dire

During voir dire, the defense was permitted to question the potential jurors about their ability to evaluate the evidence and apply the burden of proof.  Underwood's counsel questioned the potential jurors on their ability to fairly evaluate a defendant who did not take the stand and on potential racial bias.  Defense counsel then sought to go further and question the potential jurors about their attitudes toward specific types of evidence, specifically their stances on other acts evidence and whether they would be able to follow instructions on the limitations of character evidence.  The judge prohibited such questions.

3. Trial Testimony

At trial, the jury heard from officers who testified to what they saw leading up to Underwood's arrest, as described above.  The Government presented an expert who explained common practices of drug dealers.  He explained the value of the type of methamphetamine found in the Jeep and on Underwood's person and the common amounts for dealers to have on their person versus the amounts one would expect from a user.  He interpreted the terms for methamphetamine used among dealers, and explained the common practices of dealers, such as

working out of a car in a location that could not be tied to them and communicating by text with potential clients. He also testified that drug dealers typically do business in cash and will frequently advertise their success with "glory photos"—photos of themselves with cash and firearms. Firearms are common both in the photos and in the possession of those present at drug deals because dealers often need armed security to protect their cash.

Underwood's co-defendant, Shears, who by that time had been acquitted, also testified as follows. Shears drove the Jeep Compass to Maple Street with Jones and Bible, and Underwood met them there carrying a backpack. While Underwood was at the car, VanPelt approached and offered to sell a pink gun. Underwood spoke with VanPelt and then walked over to VanPelt's house. When Underwood returned from the house, he approached the backseat of the car, asked for a digital scale, and then did something Shears could not see in the backseat with the scale. He walked away from the car, at which point the police arrived. Jones's girlfriend Haley Howard testified that she had seen Underwood after his arrest, and that he admitted to her that the backpack in the Jeep was his.

The Government also presented the evidence Underwood had challenged on evidentiary grounds prior to trial, introducing Underwood's texts about drug dealing and the photos of Underwood posing with cash and a gun. Chatman testified about VanPelt having the gun and about reporting it to the police, but when it came to discussing what he had seen at the Jeep Compass, he claimed he could not remember what had happened. The Government showed Chatman his grand jury testimony to refresh his recollection, but his recollection was not refreshed. The court then permitted the Government to read grand jury testimony into the record in which Chatman had explained that he saw Underwood leaning into the back seat of the Jeep. The Government then asked Chatman if he had seen Underwood with the pink and gray gun. Chatman said he assumed so but didn't remember and then shifted and said that he did remember seeing pink and gray but not that it was a gun. The Government then impeached Chatman with the portion of his grand jury testimony in which he said he saw a pink and gray gun.

4. Jury Instructions

On the first day of trial, the district court filed a set of draft jury instructions, three of which are at issue. First, the court included pattern instruction 2.01 which encompasses the following language:

> Also keep in mind that whether anyone else should be prosecuted and convicted for these crimes is not a proper matter for you to consider. The possible guilt of others is no defense to a criminal charge. Your job is to decide if the government has proved the defendant in this case guilty. Do not let the possible guilt of others influence your decision in any way.

Next the court included an instruction drawn from pattern instructions 2.10 and 2.11 on actual, constructive, and joint possession, which read in pertinent part:

> Next, I want to explain something about possession. The government does not necessarily have to prove that the defendant physically possessed the methamphetamine for you to find the defendant guilty of this crime. The law recognizes two kinds of possession – actual possession and constructive possession.
>
> Either one of these, if proved by the government, is enough to convict.
>
> > (A) To establish actual possession, the government must prove that a defendant had direct, physical control over the methamphetamine and knew that he had control of it.
> >
> > (B) To establish constructive possession, the government must prove that a defendant had the right to exercise physical control over the methamphetamine, and knew that he had this right, and that the defendant intended to exercise physical control over the controlled substance at some time, either directly or through other persons.
> >
> > (C) One more thing about possession. The government does not have to prove that the defendant was the only one who had possession of the methamphetamine. Two or more people can together share actual or constructive possession over property. And if they do, both are considered to have possession as far as the law is concerned.
> >
> > > (i) For example, if you left something with a friend intending to come back later and pick it up, you would have constructive possession of it while it was in the actual possession of your friend.
> > >
> > > (ii) But understand that just being present where something is located or with others who had possession does not equal possession and is not enough to convict. The government must prove that the defendant had actual or constructive possession of

the methamphetamine, and knew that he did, for you to find the defendant guilty of this crime. This, of course, is all for you to decide.

Finally, the court included an instruction on aiding and abetting drawn from pattern instruction 4.01:

(1) For you to find the defendant guilty of possession of methamphetamine with intent to distribute, it is not necessary for you to find that he personally committed the crime. You may also find him guilty if he intentionally helped someone else to commit the crime. A person who does this is called an aider and abettor.

(2) But for you to find the defendant guilty of possession of methamphetamine with intent to distribute as an aider and abettor, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

(A) First, that the crime of possession of methamphetamine with intent to distribute was committed.

(B) Second, that the defendant helped to commit the crime.

(C) And third, that the defendant intended to help commit the crime.

(3) Proof that the defendant may have known about the crime, even if he was there when it was committed, is not enough for you to find him guilty. You can consider this in deciding whether the government has proved that he was an aider and abettor, but without more it is not enough.

(4) What the government must prove is that the defendant did something to help the crime with the intent that the crime be committed.

Underwood objected to all three of these instructions, but the court gave each instruction.

5. Verdict, Sentence, and Post-Trial Motions

The jury convicted Underwood of all charges. The court sentenced him to 180 months' imprisonment to be followed by five years' supervised release and a $2,000 fine.

After Underwood's conviction, it came to light that an Assistant U.S. Attorney ("AUSA") assigned to the case had his Michigan Bar license administratively suspended from February 14 through March 10, 2023, for inadvertent failure to pay bar dues. Underwood's trial took place during this time period. After the AUSA became aware of the issue, he notified the

court, in a letter dated March 17, 2023, that he had been unaware of the issue with his bar dues and had rectified the matter as soon as it came to his attention.

Underwood moved to dismiss his conviction. He argued, first, that the AUSA in question was not authorized to represent the United States Government or to practice in the Western District of Michigan, and that this stripped the court of jurisdiction to hear a case brought by that AUSA and amounted to prosecutorial misconduct. He also argued that the failure of the AUSA to disclose that he was unlicensed amounted to a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The district court denied Underwood's motion.

## II. ANALYSIS

Underwood raises ten issues on appeal. We address each in turn.

### A. The Constitutionality of § 924(c)(1)(A)

Underwood argues that 18 U.S.C. § 924(c)(1)(A) is unconstitutional and renders his conviction thereunder unconstitutional. We review challenges to the constitutionality of a statute de novo. *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018).

Section 924(c)(1)(A) provides a sentencing enhancement:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

Underwood argues that this provision violates the Second Amendment to the United States Constitution. At the outset we note that our circuit has recently considered the issue and decided

that Section 924(c)(1)(A) does not offend the Second Amendment. *United States v. Risner*, -- F.4th --, 2025 WL 569950 (6th Cir. Feb 21, 2025). But even were we not bound by circuit precedent to hold as we do, we would hold that Section 924(c)(1)(A) is not unconstitutional. Because Underwood raises some slight variations on the arguments addressed in *Risner*, we will turn to the merits here.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The right, however, is only a right to "bear[] arms for a lawful purpose," *id.* at 620 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)), not a right to "keep and carry any weapon . . . for whatever purpose," *id.* at 626. Even within those bounds, the right is not unlimited. *Id.* "Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 (2022).

In *Bruen*, the Supreme Court provided the framework for determining whether a firearm regulation violates the Second Amendment. *Id.* at 19. A court considering such a challenge must first determine whether the amendment's plain text covers the conduct at issue. *Id.* at 24. If so, the Government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In other words, at the first step, we consider whether the conduct at issue is part of the relevant "right . . . to keep and bear arms," by the plain text of the amendment, and then, at the second, we undertake a historical analysis to identify whether the founders would have accepted such a law. We consider each step in turn.

1. The Plain Text

The plain meaning of the "right . . . to keep and bear arms," has been extensively explored in Supreme Court precedent. In the 19th century, the Court described the Second Amendment right as a right to "bear[] arms for a lawful purpose." *Cruikshank*, 92 U.S. at 553.

And that conception has persisted into our modern understanding of the Second Amendment as protecting "a personal right to keep and bear arms *for lawful purposes*, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (emphasis added). In *Heller*, the Court explained that, while the Second Amendment protects the keeping and using of arms for the "lawful purpose" of self-defense, 554 U.S. at 628, it does not "protect the right of citizens to carry arms for *any sort* of confrontation," *id.* at 595.

An individual who uses a firearm "in relation to any crime of violence or drug trafficking crime" or "in furtherance of any such crime, possesses a firearm" as proscribed by § 924(c)(1)(A) is not bearing arms *for a lawful purpose*. Indeed, such a person is specifically bearing arms to promote unlawful ends. The individual's conduct is, therefore, not the type of conduct encompassed within the Second Amendment right.

2. The Historical Justification

Even if the conduct at issue is covered by the plain text of the amendment, however, there are ample historical precursors to justify § 924(c)(1)(A). At this second step, where there is a "comparable tradition of regulation" from "before, during, and even after the founding," the law will stand. *Bruen*, 597 U.S. at 27. The Court has cautioned that this step should not be construed as a "regulatory straightjacket." *Id.* at 30. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*; *see also United States v. Rahimi*, 602 U.S. 680, 691-92 (2024) ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

The common law tradition carried over to the United States from England included a tradition of criminalizing the carrying of firearms in a way that would terrify the King's subjects. *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (1686) (interpreting the statue of Northampton as affirming the common law prohibition against going armed to "terrify the King's subjects" (citing 1328 Statute of Northampton, 2 Edw. 3 c. 3 (Eng.)). Under these laws, individuals were permitted to bear arms, but they could be prohibited from doing so in furtherance of dangerous or "terrifying" ends. Indeed, the Second Amendment was based, in part, on laws from a similar

time period that made explicit the distinction between bearing arms for lawful, defensive purposes and for unlawful purposes. For instance, the English Declaration of Rights codified during the reign of William and Mary declared "[t]hat the Subjects which are Protestants, may have Arms *for their Defense* suitable to their Conditions, and *as allowed by Law*." *Bruen*, 597 U.S. at 44 (emphasis added) (quoting 1 W. & M., ch. 2, § 7).

In the period surrounding the founding, many states, apparently operating under this precise distinction, began to provide for enhanced punishment for crimes committed while the perpetrator was armed with a deadly weapon. *See, e.g.*, An Act for the Punishment of Burglary and Robbery, 1783 Conn. Laws 633 ("[W]hosoever shall commit Burglary by breaking up any Dwelling House or Shop . . . if in the Perpetration of said Crimes the Person or Persons committing the same shall . . . be so Armed with any dangerous Armour or Weapon as clearly to Indicate their violent Intentions; such Person or Persons found Guilty as aforesaid and being thereof convicted before the Superior Court shall Suffer Death"); A LAW respecting CRIMES and PUNISHMENTS, 1799 Miss. Laws 44-47 (imposing an additional punishment upon burglaries committed while "armed with any dangerous weapon or weapons, as clearly to indicate a violent intention"); Burglary, 1807 Ind. Terr. Laws 21-22 (similar); An Act providing for the punishment of Crimes of Burglary and other breaking and entering of buildings, 1821 Me. Laws. 61-63 (similar). Thus, seemingly, the founders anticipated the regulation of firearms insofar as it involved prohibiting people from using them to engage in criminal activity.

Underwood argues that there is no appropriate historical analogue for § 924(c)(1)(A) because there were no founding era laws prohibiting the use of a firearm associated with a drug crime (and indeed there were no drug crimes at the time). But our search is not limited to historical twins. It merely requires historical analogues. *Bruen*, 597 U.S. at 30. The founders presumed they could regulate the use of weapons in the furtherance of criminal activity. And, at the very least, as we noted in *Risner*, the founders presumed that they could regulate the use of weapons for dangerous ends, and drug dealing is dangerous. 2025 WL 569950 at *5. There is no reason to suppose, therefore, that regulating the use of firearms as associated with the criminal drug trade offends the Second Amendment.

**B. Reasonable Suspicion for Underwood's Detention**

Underwood alleges that his rights under the Fourth Amendment were violated when he was detained by the officers as they approached the Jeep Compass. He argues that, as a result, the fruits of that arrest should have been suppressed. When reviewing a district court's denial of a motion to suppress, we review findings of fact for clear error and review conclusions of law de novo. *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022). We consider the entirety of the record including both trial evidence and evidence admitted at the suppression hearing. *United States v. Hardin*, 539 F.3d 404, 417 (6th Cir. 2008).

Under the Fourth Amendment, an officer may not detain an individual even briefly without a warrant unless the officer has "specific and articulable facts which, taken together with rational inferences from those facts," create a reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). We must undertake an objective analysis to determine whether the officers had reasonable suspicion. *Id.* While officers may rely upon a tip to generate reasonable suspicion, courts may scrutinize the information obtained from the tipster for indicia of reliability as part of a totality of the circumstances analysis. *Adams v. Williams*, 407 U.S. 143, 147 (1972) ("[W]hile the Court's decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." (internal citations omitted)).

In this case, the police had a tip regarding illegal activity. That tip came from an individual who identified himself, subjecting himself to potential prosecution for making a false report if his tip was incorrect. *See id.* at 146-47 (noting that identification of the informant increases the reliability of a tip). By the time the officers approached Underwood, they had already corroborated several key features of the tip. Chatman reported that there would be a gun sale between VanPelt at a specific location with a specific type of car. The police observed an identical car at that location and observed VanPelt approaching Underwood and then walking away waving money. All of this raises a rational inference that the tip was correct.

If the tipster was to be believed, what the officers were observing when they saw VanPelt approach Underwood and then walk away with money was the sale of a stolen firearm—i.e.,

criminal activity. The officers, therefore, had reasonable suspicion that Underwood had engaged in criminal activity. Thus, the Fourth Amendment permitted them to briefly detain Underwood. *See Terry*, 392 U.S. at 21.

Underwood raises three arguments in response. First, he argues that the tip was insufficient because, while Chatman identified himself, the police did not know him or have experience with him. Underwood argues that Chatman could have been lying about his identity, rendering him functionally an anonymous tipster. But even if this court were to construe Chatman as an anonymous tipster, "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (alteration in original) (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)). Thus, Chatman's "anonymity" would merely be one factor in this court's analysis, and other indicia of reliability might justify police reliance on the tip. *See United States v. May*, 399 F.3d 817, 824 (6th Cir. 2005). Thus, even assuming that Chatman was anonymous, we must delve into the other indicia of reliability attendant to this tip.

A tipster's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight" than might be otherwise afforded to a tip about illegal activity. *Illinois v. Gates*, 462 U.S. 213, 234 (1983). In this case, Chatman alleged that he was describing the activities of VanPelt and the men in the Jeep contemporaneously. Further, where police are able to corroborate the innocent details of the tipster's story, they may regard the tipster as sufficiently reliable to create reasonable suspicion of the criminal activity described. *Navarette*, 572 U.S. at 397-98. As discussed above, by the time the officers approached Underwood, they had already corroborated several key features of the tip including the location, the sale, and the type of car used. They, therefore, had reasonable suspicion that Chatman was accurate in his assertion that a gun sale, in particular, was taking place, even assuming that Chatman was anonymous. On this record, Chatman's alleged anonymity does not change our analysis.

Second, Underwood argues that, even if the tip suggested criminal activity, it never mentioned Underwood. But a tip need not name the perpetrator. *See United States v.*

*McCallister*, 39 F.4th 368, 375 (6th Cir. 2022). Chatman's tip indicated that VanPelt would be selling a gun to someone in a Jeep Compass. VanPelt interacted with Underwood right next to a Jeep Compass and then walked away with a substantial quantity of money. This was enough to at least raise reasonable suspicion that the money was the proceeds of the aforementioned gun sale and that Underwood was the person who had just bought the gun.

Third, Underwood claims that, even if his detention started out reasonable, it became unreasonable once the officers found the pink gun under the Jeep and, therefore, knew that Underwood was not in possession of it. The flaw in this logic comes from overlooking a clear concern about multiple weapons in this situation. Where there are circumstances giving rise to the suspicion that the criminal activity may involve weapons posing danger to the police, officers may use force for their own safety. *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). The officers detaining Underwood detained him on suspicion of just having purchased a gun. When the officers at the Jeep found the pink gun, they also found multiple other armed individuals and drug-related items inside the car. Thus, while the officers knew that Underwood did not have the pink gun, in particular, there was information suggesting there might be multiple guns involved in a criminal operation.

Underwood asserts that the presence of other armed people was not sufficient to raise a reasonable suspicion that he was armed. There is not, for instance, an automatic companion rule allowing police to search the companions of any armed individual. *United States v. Bell*, 762 F.2d 495, 498-99 (6th Cir. 1985). But the lack of an automatic companion rule does not mean that the presence of other armed individuals is irrelevant. *Id.* at 501. Officers are "not obliged to ignore the fact that [a suspect is] in the company of [other individuals] known to be potentially armed and dangerous in assessing the potential risk posed by [the suspect] himself." *Id.* "[T]he fact of companionship, while not itself justifying a frisk, [is] permissibly considered in analyzing whether there was reasonable cause to believe that [a suspect is] potentially armed and dangerous." *Id.* Knowledge that there are multiple armed individuals present, that there may be drug trafficking taking place, that drug trafficking frequently involves weapons, and that the individual the officer suspects has been associated with guns in the past can give rise to

reasonable suspicion to justify a stop. *See id.* at 500-02. The officer's detention of Underwood was reasonable in light of all the circumstances.

## C. The Search of Underwood's Person

Underwood next argues that, even if his detention was lawful, the officers violated his Fourth Amendment rights when they searched his person. Once again, he argues that this violation requires suppression of the fruits of that search. And, once again, we review findings of fact for clear error and review conclusions of law de novo. *Whitley*, 34 F.4th at 528.

Underwood advances three arguments that the search of his person was unlawful. First, he claims that there was no reasonable suspicion to frisk him. Second, he argues that, even if there was reasonable suspicion initially, the officer patted him down multiple times and there was no reasonable suspicion that he was armed after the first pat down. Third, Underwood asserts that the officers went beyond the type of frisk permitted as part of a *Terry* stop by manipulating the objects in his pockets in an attempt to identify them.

The first argument is analogous to Underwood's reasonable suspicion argument regarding prolonged detention. An officer can frisk a person for weapons if he has reasonable suspicion that the person is armed. *Terry*, 392 U.S. at 27; *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). As discussed above, based on the tip about the gun sale, the interactions between Underwood and VanPelt, and the presence of drug dealing equipment and other armed individuals in the car, the officers had ample evidence to develop reasonable suspicion that Underwood might have a gun, and they maintained that reasonable suspicion even after the pink gun was found.

The second and third arguments fail because they run contrary to the trial judge's apprehension of the facts. The officer testified that he had not had the opportunity to pat down Underwood's back pockets (although he did pat down Underwood's front pockets) before he handcuffed Underwood. When he re-initiated his pat down after the other officers had searched the Jeep, he touched Underwood's back pocket and immediately felt what he recognized as a tied off sandwich bag containing a substance resembling methamphetamine. He testified he was able to recognize the feeling of the bag with that level of specificity because of the hundreds of pat

downs he has done.  The trial court credited this testimony after observing body camera footage from the officers present.  The district court summarized the pat downs as follows:

> What I noticed about the video was that the initial pat, I guess it was at the minute or two mark, way at the beginning, was simply on the front pocket, and I don't even think there was a return to the front pocket that was initially touched the one where the officer testified Mr. Underwood said, that's money.  It was later a touch of the other pocket in the front.  But the first time we see any touch to the back pocket was at the six-minute mark.
>
> ***
>
> What I saw was a very brief pat.  Maybe you can count one, two or three times in the touch, but what you have is an experienced officer with hundreds of searches who says he could immediately tell in that touching, which was very limited in my opinion from watching the tape, that this was a tied-off baggy or at least consistent with a tied-off baggy that had a crystalline substance inside, and obviously in the drug business tied-off baggies are a common and well understood method of distribution.  So that's not surprising at all that a touch would indicate that to an experienced officer.

Based on the body camera footage in the record, those findings are not clearly erroneous.  Thus, this court must adopt them as true.  *Whitley*, 34 F.4th at 528.

Accepting those facts, there was no constitutional violation.  Underwood's second argument fails because the officer did not pat down Underwood's back pocket multiple times, so there is no concern that reasonable suspicion had already been eliminated by a prior pat down before the one in which the officer found the drugs.  Underwood's third argument fails because the officer did not manipulate the pocket beyond "a very brief pat" before identifying it as crystal methamphetamine.  The officers did not violate Underwood's Fourth Amendment rights when they searched his person and, therefore, the district court did not err when it declined to suppress the fruits of that search.

**D. The Warrant**

Underwood next argues that the search warrant for his phone was invalid, and the contents of his phone should have been suppressed.  In particular, Underwood alleges that (1) the warrant contained false statements—namely that the source from which the officers received the

tip was anonymous, and (2) the warrant did not describe the place to be searched with adequate particularity.

1. <u>False Statement</u>

The Fourth Amendment provides that no warrant shall be issued except upon probable cause. U.S. Const. amend. IV. This probable cause must be found based on the facts or circumstances presented to the court under oath or affirmation. *Nathanson v. United States*, 290 U.S. 41, 47 (1933). The issuing judge must determine from the affidavit provided by the officers seeking the warrant whether, "given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

In determining whether the issuing judge erred in issuing the warrant, we "do not write on a blank slate." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (brackets omitted) (quoting *Tagg v. United States*, 886 F.3d 579, 586 (6th Cir. 2018)). Rather, we give great deference to the issuing court's probable cause determination. *Id.* This court's task is simply to determine whether there was a substantial basis for the issuing court's determination of probable cause. *Gates*, 462 U.S. at 238.

A warrant may be voided on grounds that the affiant "knowingly and intentionally, or with reckless disregard for the truth," included a false statement and that such statement was "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The statement in contention here is the officer's assertion that "[w]hile conducting this surveillance your affiant was informed by an anonymous source that VanPelt was selling the handgun to an individual inside of a silver Jeep parked in the 100 block of E Maple St." Underwood contends that the characterization of Chatman as an "anonymous source" was false and materially so.

Underwood's contention fails on both prongs of the *Franks* test. First, there are multiple meanings of anonymous. A tip can be "anonymous" in the sense that the tipster's name is completely unknown to anyone in law enforcement as Underwood insists the officer must have

meant. *Anonymous*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/anonymous (last visited Feb. 14, 2025) ("of unknown authorship or origin"). But it can also be "anonymous" in the sense that the officer knows but does not provide the name. *Id.* ("not named or identified"). Indeed, this second reading is supported by another police report where officers interchangeably referred to Chatman as an "anonymous source" and a "person who wished to remain anonymous." There was, therefore, no false statement.

Nor can Underwood demonstrate that the statement was necessary to probable cause. Assuming the statement directly asserted that the tipster was entirely unknown to the officers, the anonymity could not have helped the Government obtain the warrant. Anonymity of the informant cuts against the Government in a probable cause analysis as discussed above. *May*, 399 F.3d at 824. So, if the issuing court held the incorrect belief that the tipster was entirely unknown to the officers, its probable cause finding would have been made in spite of that belief, not because of it. The district court did not err in declining to invalidate the warrant for lack of probable cause.

2. Particularity

The Fourth Amendment requires search warrants to "particularly describ[e] the place to be searched." U.S. Const. amend. IV. We review the warrant's particularity de novo. *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989). This requires a fact intensive review of the particular circumstances in each case. *United States v. Durk*, 149 F.3d 464, 465-66 (6th Cir. 1998).

An officer may not seize one object or search one place when the warrant describes another, and the warrant must be particular enough so that, as to the place to be searched, "nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). This does not mean that the description given in the warrant must be perfect, however. The warrant must simply be "such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). Where there are flaws or inaccuracies in a warrant, the question is not whether the warrant "is technically accurate in every detail"; instead, we ask whether the warrant

was deficient in a way that leaves "any reasonable probability that another premises might be mistakenly searched." *Durk*, 149 F.3d at 465 (quoting *United States v. Prout*, 526 F.2d 380, 387-88 (5th Cir. 1976); *Gahagan*, 865 F.2d at 1496). Where one part of the description of the site to be searched is inaccurate, but "the description has other parts which identify the place with particularity," the warrant may be upheld. *Id.* at 466. We turn, then, to the cases in which we have analyzed inaccuracies in warrants.

In *Durk*, we held that, where the warrant transposed two numbers in the address— identifying the street address as "4612 Fulton" instead of "4216 Fulton"—but otherwise gave a highly specific description of the house and its attached shed with a door latched by a plastic tie the warrant was valid. *Id.* at 465-66. In *United States v. Pelayo-Landero* we held that where the warrant gave the address of a trailer as the address of the access road to the trailer rather that the trailer's correct address (which was disputed) but accurately gave directions to the trailer and a description of its physical characteristics, the warrant was valid. 285 F.3d 491, 495 (6th Cir. 2002). In *United States v. Howard*, we held that a warrant was valid where it described two adjacent mobile homes, sharing a mailbox, located at "15712 Carlisle Road" and it later transpired that the second home extended onto a different parcel of land. 621 F.3d 433, 456 (6th Cir. 2010)

By contrast, in *Knott v. Sullivan*, we considered whether a warrant had accurately described a vehicle to be searched. We noted that

> [V]irtually every descriptor of the vehicle included in the search warrant and accompanying affidavit was incorrect: the vehicle's make and model were wrong, the vehicle identification number was wrong, and the vehicle's license plate number was wrong. Indeed, the only portion of the description contained in the warrant that appears to have been correct is the statement that the vehicle was "[l]ocated at the ACSO [Athens County Sheriff's Office] garage."

418 F.3d 561, 569 (6th Cir. 2005) (alterations in original) (internal citations omitted). There, we held that "the errors in the search warrant and affidavit were so extensive that there was a reasonable probability that the wrong vehicle could have been mistakenly searched." *Id.* Similarly, in *United States v. Watkins*, we considered a warrant written for a property with two houses. 179 F.3d 489, 492 (6th Cir. 1999). The warrant gave an accurate description of one of

the houses but was used to search the other house. *Id.* 492-93. We held that the warrant's reference to the first house and not the second did not provide the officers with enough information to ascertain that the second house was the target with reasonable effort (although we also found that the good faith exception applied). *Id.* at 495.

In this case, the warrant described the phone as an "Apple iphone touch screen style cell phone, silver in color with a blue case" and indicated that it had been taken from Underwood as part of a search incident to arrest. However, it listed the wrong phone number for the phone. Underwood argues that the incorrectly listed phone number defeats the particularity of the warrant. But the warrant indicated that the officers should search the single phone recovered from Underwood, providing a clear directive regarding which phone they should search. It provided correct physical details of that phone in case there was any confusion. Given that officers recovered only one phone from Underwood, and it matched the description in the warrant, there was no reasonable probability officers would search the wrong phone, despite the incorrect phone number. Applying the governing standards to this record, Underwood's phone number argument fails.

In a single line in his brief, Underwood states that, "[t]he warrant also lacked particularity when it described the property to be seized as, 'Any electronic data within the aforementioned phones.'" Appellant's Br. 36. The full statement in the warrant is that the property to be seized is "Any electronic data within the aforementioned phones. The electronic data including; Recent calls (incoming and outgoing calls), contacts, instant messages, text messages, phone numbers, direct connect numbers, pictures, videos, and any other digital media *that would be evidence of drug trafficking*." R. 321-3, Warrant, PageID 2185 (emphasis added). In short, the request was tailored to evidence of drug trafficking. The search of an entire personal device for evidence of a specific type of criminal activity is permissible. *United States v. Richards*, 659 F.3d 527, 539-40 (6th Cir. 2011) (collecting cases). It was permissible here too.

## E. The Admissibility of the Contested Texts and Photos

Underwood next argues that the district court erred when it admitted Government exhibits showing Underwood's past history of text messages regarding drug dealing and photos

of Underwood posing with large amounts of cash and a single gun.  He claims that these exhibits were impermissible under Federal Rule of Evidence 404(b) which provides that:

> Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . .  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

For a party to admit potential "other act" evidence, it must persuade the district court that (1) there is sufficient evidence that the act took place, (2) the evidence was admissible for a proper purpose, and (3) the probative value of the other acts evidence when offered for the proper purpose is not substantially outweighed by the unfairly prejudicial effect.  *United States v. Bell*, 516 F.3d 432, 440-41 (6th Cir. 2008).

There has been some dispute in our circuit concerning the proper formulation of the standard of review for a district court's decisions on the admissibility of Rule 404(b) evidence.  *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015).  In some cases, we have applied an abuse of discretion standard.  *See e.g., United States v. Johnson*, 24 F.4th 590, 605 (6th Cir. 2022).  It is widely agreed that "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 572 U.S. 559, 563 n.2 (2014) (citing *Cooter & Gell v. Hartman Corp.*, 496 U.S. 384, 405 (1990)).  Thus, under the abuse of discretion standard, we reverse if the district court relied on clearly erroneous findings of fact in its factual determinations, uses an erroneous legal standard, or improperly applies the law.  *United States v. Betro*, 115 F.4th 429, 443 (6th Cir. 2024).  In other cases, we have set out a formulation that indicates the court is applying a different standard of review to each part of the 404(b) analysis.  *See e.g.*, *United States v. Clay*, 667 F.3d 689, 693–96 (6th Cir. 2012).  Under that standard, we review the district court's finding that an act took place for clear error, we review the finding of proper purpose de novo, and we review the district court's balancing of prejudice for abuse of discretion.  *Id.*

At times we have posited that these tests amount to the same thing.  *Id.*  We have noted that the first step of the 404(b) analysis is a factual determination, so a district court has abused

its discretion if it rests its conclusion on a clearly erroneous factual finding. *Id.* Similarly, the second step of the analysis is a legal determination, so a district court has abused its discretion if it improperly applies the law. *Id.* And the third step is reviewed for abuse of discretion under either test. *Id.* At other times, we have suggested this difference in formulation amounts to an intra-circuit split. *Johnson*, 24 F.4th at 605. In any case, we need not determine whether our circuit is truly split and, if so, which formulation is correct, because Underwood's argument fails under any formulation.

Here, there is no dispute that the other acts took place. In the case of the pictures, the acts were photographed, and in the case of the text messages, the acts were described by the defendant. The parties instead dispute whether the evidence was offered for a proper purpose and whether the district court appropriately weighed the prejudicial effect of the evidence. The use of past drug dealing to demonstrate drug dealing on a specific occasion runs very close to the prohibitions of Rule 404. Our circuit's precedent makes clear, however, that in certain circumstances past drug dealing may be used to prove "intent" under Rule 404(b). "[W]here the crime charged is one requiring specific intent," the Government may "use 404(b) evidence to prove that the defendant acted with the specific intent." *United States v. Bilderbeck*, 163 F.3d 971, 977 (6th Cir. 1999). As a result, evidence of prior drug dealing is generally admissible in a drug case to prove intent to distribute. *United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011) (collecting cases). Underwood pleaded not guilty to possession with the intent to distribute, so his intent was an element the prosecution needed to demonstrate. Therefore, evidence that Underwood was involved in a drug distribution operation was probative for a non-character purpose. *Id.*

Underwood argues that the photographs could not demonstrate intent because, while they showed Underwood with large amounts of cash and a firearm, they did not show him with drugs or involved in drug distribution. Though the texts discuss drug dealing, they do not indicate intent to distribute on this particular day, so Underwood contends they can be no more helpful than a claim that "because he did it before he will do it again." These arguments were undermined by the testimony of the Government's expert. The expert explained that drug trafficking is a cash business, and it is common for traffickers to advertise their success by taking

photos with large amounts of cash and often firearms.  The photos showed Underwood posing with large quantities of cash, ostentatiously displayed, and at least one firearm.  Similarly, the expert testified that drug dealers usually communicate with customers via text and identified the terminology used in drug dealing.  That same terminology appeared in the text messages not just in isolated incidents, but over a period of several months with reference to the specific location where the alleged trafficking occurred in this case.  This evidence was probative of intent and, therefore, admissible for a proper purpose.  *United States v. Mauldin*, 109 F.3d 1159, 1161 (6th Cir. 1997) (admitting evidence of prior drug dealing in similar amounts in the same location as the charged crime).

As to prejudice, Underwood makes similar arguments.  He contends that the connection between his charged crimes and the past drug dealing was too attenuated to be probative of intent and was likely to be taken as character evidence.  This claim fails for largely the same reason as Underwood's argument about proper purpose.  The texts and photos were connected directly to evidence of participation in the business of drug dealing.  Thus, the district court did not err by admitting them.

## F.  Voir Dire

Underwood next alleges that his Sixth Amendment rights were violated when the trial court prohibited defense counsel from questioning the potential jurors on their stances on other acts evidence and whether they would be able to avoid using them as a form of character evidence.  We review the district court's rulings on voir dire for an abuse of discretion.  *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993).

A defendant has a right, under the Sixth Amendment, to a trial by an impartial jury.  U.S. Const. amend VI.  The purpose of voir dire is to ensure that the court is able to remove prospective jurors who may not be able to impartially follow the court's instructions and apply the law to the facts.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  Based on this core function, the Supreme Court has specified certain questions the trial judge must allow.  *Id.* at 189 (describing "special circumstances" under which a question on racial bias must be allowed).  Outside those circumstances, however, trial judges have broad discretion in deciding

how voir dire will be conducted and what questions will be asked. *Id.* at 189-90. "The Constitution 'does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.'" *Bedford v. Collins*, 567 F.3d 225, 232 (6th Cir. 2009) (quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)). A reviewing court, therefore, must be "mindful that the trial court's vantage point gives it a superior perspective to assess which inquiries will be fruitful in uncovering bias and which will not be." *Id.*

*Bedford* articulates the governing standard: "What matters is whether the defendant's inability to ask a question renders the proceeding 'fundamentally unfair' by making it impossible to identify an unqualified juror." *Id.* at 232 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991)). Once the judge has ensured that the jury generally understands its role and its obligation to follow the court's instructions, the court may prohibit further questioning regarding how the potential jurors would apply those instructions to specific facts. *Id.*

In this case, the court had already questioned the jurors on their ability to follow court instructions and to fairly and impartially apply the law. The court also cautioned that "when we start talking about specific evidentiary issues and arguments, that's off limits." The court did not abuse its discretion in setting that limitation. Further questioning on the potential jurors' specific thoughts about evidence that might be admitted was not required to ferret out bias or an inability to follow court instructions. Instead, it would serve primarily to gauge juror views on particular types of evidence. *United States v. Cramer*, 491 F. App'x 520, 523-24 (6th Cir. 2012) (upholding the trial judge's decision to prohibit questions that were "tailored to elicit jurors' receptiveness to Defendant's theory of the case, more than the jurors' ability to be fair and impartial"). On this record, the court's refusal to permit that questioning was not an abuse of discretion.

## G. The Sufficiency of the Evidence

This court reviews the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Williams*, 998 F.3d 716, 727 (6th Cir. 2021). Reversal is appropriate only where the "judgment is not supported by

substantial and competent evidence upon the record as a whole." *Id.* at 728 (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1985)). The evidence may be direct or circumstantial. *Id.* It is not this court's place to resolve conflicts in the facts or evaluate credibility. *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994). Rather, we must draw rational inferences in favor of the prosecution and evaluate the evidence from that posture. *Id.* at 1439.

Underwood does not dispute that the evidence was sufficient to support his conviction for possession with intent to distribute the methamphetamine found in his back pocket. He contests that the evidence was sufficient to support a conviction on any of the other three charges: possession with intent to distribute 50 grams or more of methamphetamine for the drugs found in the backpack, possession of a stolen firearm for the pink gun, and possession of a firearm in furtherance of a drug trafficking crime. Underwood alleges that the evidence was insufficient to prove that he possessed either the pink gun or the drugs in the backpack.

Regarding the sufficiency claim for the drugs in the backpack, the testimony of a single witness, if believed, can be a sufficient basis to support a federal conviction. *United States v. Washington*, 702 F.3d 886, 891-92 (6th Cir. 2012). Here there was more. In this case, there was only one backpack found in the car or at the scene. Shears testified that Underwood arrived with the backpack. Howard testified that Underwood confessed that the backpack in the Jeep was his. This alone is enough for a rational juror to conclude that the backpack, and the drugs therein, belonged to Underwood and that he possessed the drugs when he possessed the backpack.

As for the gun, Chatman's grand jury testimony in which he alleged that he saw Underwood with the gun in his waistband was read onto the record as a prior inconsistent statement. Even relying only on the circumstances Chatman claimed to remember at trial, Underwood showed him something pink in his waistband immediately after Underwood met with VanPelt, who was known to possess a pink gun and to be attempting to sell it. VanPelt, in turn had a substantial amount of cash after he met with Underwood. A rational juror could infer from this evidence that Underwood paid VanPelt for the gun.

As for the gun's use in furtherance of the drug trafficking crime, the Government produced expert testimony that guns are commonly used to protect large amounts of drugs. Underwood purchased the gun while he was holding a large quantity of drugs and while he was gathered with other individuals with drugs and the types of digital scales commonly used for drug dealing. A rational juror could conclude that Underwood purchased the gun to protect his supply of drugs and that, therefore, he possessed it in furtherance of his drug crimes.

### H. Rule 803(5) Evidence

Underwood next argues that the district court erred in permitting the Government to read a portion of Mr. Chatman's grand jury testimony into the record after he professed that he was unable to recall what he saw on the day of Underwood's arrest. In criminal cases, admission of an out of court statement against the defendant implicates two potential issues. First under the Confrontation Clause of the Sixth Amendment, a defendant has the right to confront his accusers through cross examination. U.S. Const. amend VI. Second, under the hearsay rule, an out of court statement may not be admitted for the truth of the matter asserted unless it falls under some exception. Fed. R. Evid. 801, 802. Underwood alleges that both issues are implicated by the Government's reading of Chatman's grand jury testimony. We review Underwood's constitutional allegation de novo and his evidentiary allegation for abuse of discretion. *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009).

A defendant's rights under the Confrontation Clause are satisfied where the declarant of the out of court statement at issue is also a witness who is under oath and subject to cross examination at trial. *United States v. Owens*, 484 U.S. 554, 558-60 (1988); *accord United States v. Kappell*, 418 F.3d 550, 554-56 (6th Cir. 2005). Thus, that the Government seeks to read a prior statement of a testifying witness into the record, does not present a constitutional issue, provided that the defendant is given the opportunity at trial to thoroughly cross examine the witness on the statement. *Owens*, 484 U.S. at 559. This holds true even where the witness is claiming memory loss as to the subject matter of the statement. *Id.* The defendant has the right to cross examine the witness regarding his credibility, and, if necessary, to question the witness about whether his alleged memory loss is genuine. *Id* at 559-60. In this case, there is no dispute that Chatman took the stand and was under oath and subject to cross examination at trial.

Underwood was free to cross examine him regarding his credibility, the extent of his memory, and the truthfulness of his claim to be unable to remember what had occurred on Maple Street. No constitutional issue existed on this record.

As for the hearsay issue, Rule 803(5) is an exception to the rule against hearsay. It provides that a party may admit into evidence:

> A record that:
>
>> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
>>
>> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
>>
>> (C) accurately reflects the witness's knowledge.

Fed. R. Evid. 803(5). "If admitted, the record may be read into evidence[.]" *Id.* Rule 803(5) may be used where the witness claims not to remember something that he once memorialized, even where his claimed lack of memory appears to be disingenuous. *United States v. Porter*, 986 F.2d 1014, 1017 (6th Cir. 1993).

In this case, Chatman testified unequivocally that he was unable to remember what had happened. It is possible that his lack of memory was feigned, but, whether by design or by genuine inability, he was unable to testify as to what he had seen, which satisfies the requirements of Rule 803(5)(A). *See id.* Underwood argues that there was not sufficient evidence to demonstrate that the witness was, in fact, unable to remember what had happened and cites cases in which courts rejected the use of Rule 803(5) where there was no foundation for a lack of memory. *See United States v. Judon*, 567 F.2d. 1289, 1294 (5th Cir. 1978). Underwood contends that Chatman's ability to remember many other details of the day undercuts his claim not to be able to remember the specific details at issue. But there is a difference between cases in which the witness has given no testimony whatsoever regarding his lack of memory and one in which the defendant simply does not believe that the witness is being truthful regarding his lack of memory. In the latter situation, Rule 803(5) may be applied even where the witness appears to be disingenuous. *Porter*, 986 F.2d at 1017.

Turning, then, to the statement itself, the reliability of statements under Rule 803(5) must be determined on "a case-by-case basis upon a consideration . . . by the district court . . . of factors indicating trustworthiness, or the lack thereof." *Id.* Here, the statement the Government sought to introduce was Chatman's grand jury testimony made within a month of the incident he was describing when it was fresh in his mind and while he was under oath. Underwood urges that these indicia of reliability are insufficient. He argues that, because Chatman used substantial amounts of marijuana, the testimony he gave before the grand jury may not have been fresh or clear in his mind, and that Chatman's shifting story about his lack of memory and some discrepancies in his testimony indicate that his grand jury testimony might not have been entirely accurate. Underwood urges the court to consider that the important purpose of the restrictions on the exception are to ensure that the jury does not hear unreliable evidence. *Id.* ("The touchstone for admission of evidence as an exception to the hearsay rule has been the existence of circumstances which attest to its trustworthiness." (quoting *United States v. Williams*, 571 F.2d 344, 350 (6th Cir. 1978))). As a result, Underwood argues that neither Rule 803(5)(B) nor Rule803(5)(C) was satisfied.

Chatman testified that he gave the grand jury testimony under oath. He confirmed that he told the grand jury what he knew at the time. While testifying before the grand jury, he was able to recount the details of what had happened. The district court specifically inquired at trial as to when the grand jury testimony was given and determined that it was less than a month after the incident at issue. Given these indicia of reliability, it was not unreasonable for the district court to conclude that the prior statements were made while the matter was still fresh in Chatman's mind and that his recounting to the grand jury accurately reflected his memory at the time, even if he was unable to recall what had happened by the time of trial, several years later. On this record, the admission of the statements was not an abuse of discretion.

## I. The Jury Instructions

"When jury instructions are claimed to be erroneous, [we review] the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Russell*, 595 F.3d 633, 642 (6th Cir. 2010) (quoting *United States v. Frederick*, 406 F.3d

754, 761 (6th Cir. 2005)). The fact that an instruction mirrors or copies the pattern instructions weighs in favor of a finding that the instruction was not misleading. *See United States v. Blackwell*, 459 F.3d 739, 765 (6th Cir. 2006). In *Blackwell*, for instance, where "only one sentence of the second portion of the trial court's instruction differ[ed] from the pattern jury instructions," we held that the instruction was neither misleading nor erroneous. *Id.* The same reasoning applies here. The instructions given in this case were near verbatim recitations of the pattern instructions.

Nevertheless, Underwood alleges two types of problems with the jury instructions. First, Instruction 2.01 was misleading because it suggested to the jury that part of Underwood's defense—his claim that someone else possessed the pink gun—was legally irrelevant. He claims that Instruction 2.01 should not have been given because he was alleging someone else was guilty. We have rejected that argument multiple times. *See, e.g.*, *Smith v. United States*, 285 F. App'x 209, 215 (6th Cir. 2008) (collecting cases). As we explained in *Smith*, this jury instruction speaks to the fact that multiple perpetrators may commit a possession offense and the guilt of one does not necessarily imply (or even probabilistically indicate) either the guilt or the innocence of another. *Id.* This is true even where the defendant's primary defense, as here, is to point to an alternate suspect. *Id.* at 215 n.1. The district court did not err in giving Instruction 2.01.

Second, Underwood alleges that Instructions 2.10, 2.11, and 4.01 were erroneously given, not because they define the law in a misleading way on their face, but because they point the jury toward a legally irrelevant theory unsupported by the evidence in this particular case. A district court can err in giving an instruction when there is insufficient evidence to support a conviction based on that instruction. *United States v. Mari*, 47 F.3d 782, 786 (6th Cir. 1995). But the instruction on joint, actual, and constructive possession was supported by the evidence. Police found Underwood in physical possession of some of the drugs for which he was charged—i.e., the drugs in his pocket. And police found more drugs in a backpack that was not in his physical possession at the time of arrest, but which several witnesses alleged was in his control. It was important, therefore, for the jury to understand both actual and constructive possession. Similarly, the Government alleged and presented evidence that Underwood owned the pink gun,

having just purchased it from VanPelt, but that he had given it to Jones, who was seen with it when the police arrived. An instruction on joint possession was, therefore, appropriate.

As for the instruction on aiding and abetting, aiding and abetting is "a theory of liability 'embodied in every federal indictment, whether specifically charged or not.'" *United States v. McGee*, 529 F.3d 691, 695 (6th Cir. 2008) (quoting *United States v. Floyd*, 46 F. App'x 835, 836 (6th Cir. 2002) (order)). Here, the case for an aiding and abetting instruction is particularly strong because the Government expressly charged 18 U.S.C. § 2, the statutory provision for aiding and abetting, in the indictment. And the evidence supported this theory. The drugs were in the back of the car and multiple people had access to the scales that were presumably used for selling drugs. There was evidence, therefore, that one of the other occupants of the car was selling drugs and Underwood was aiding them when he brought the backpack with the methamphetamine to the car.

**J. The Licensure of the AUSA**

Underwood argues that the fact that the AUSA who prosecuted him was administratively suspended for nonpayment of bar dues was prosecutorial misconduct creating good cause to dismiss his case. Alternatively, Underwood alleges that the lack of a properly licensed AUSA creates a jurisdictional defect and a *Brady* issue. We review each of these claims de novo. *United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir. 2008) (prosecutorial misconduct); *United States v. Johnson*, 932 F.3d 965, 966 (6th Cir. 2019) (per curiam) (jurisdictional defect); *United States v. Rafidi*, 829 F.3d 437, 446-47 (6th Cir. 2016) (existence of a *Brady* violation).

In the Western District of Michigan there is an administrative order allowing attorneys licensed in the Western District of Michigan to continue to practice even when their Michigan bar license is suspended solely for the nonpayment of dues. *In re: Suspension of Attorneys Solely for Non-Payment of State of Michigan Bar Dues*, No. 23-AD-024 (W.D. Mich. 2023). The order expressly states that "[a] suspension solely for non-payment of State Bar dues does not amount to professional misconduct, or otherwise suggest an inability to meet the standard of practice established for persons admitted to practice before this Court" and provides that attorneys will not be suspended from the federal district court. *Id.* The Supreme Court has

acknowledged that admission to a federal court need not necessarily track admission to the corresponding state court. *Theard v. United States*, 354 U.S. 278, 281 (1957). Thus, there was no professional or prosecutorial misconduct inherent in the AUSA continuing to prosecute Underwood in the Western District of Michigan.

Nor did the AUSA's lapsed license create a jurisdictional defect. Even assuming for the sake of argument that the AUSA was no longer an authorized representative of the Government because he no longer had a state bar license as the Department of Justice requires for pay purposes, U.S. Dep't of Just., Just. Manual § 1-4.110 (2018), the case was brought in the name of an authorized representative of the Government, *United States v. Bennett*, 464 F. App'x 183, 184-85 (4th Cir. 2012) (per curiam) ("A federal court is without jurisdiction in a criminal prosecution where the Government lacks *an* authorized representative." (emphasis added) (citing *United States v. Providence Journal Co.*, 484 U.S. 693, 708 (1988)). All proceedings were conducted in the name of the United States Attorney, not the AUSA, and, at all pertinent times, a second, licensed AUSA was present as a representative of the Government. There was no jurisdictional defect.

Finally, there was no *Brady* issue because, even if the Government had known about the defect in the AUSA's license, *Brady* requires the prosecution to turn over evidence only if it is favorable to the accused and material to either guilt or punishment. *Brady*, 373 U.S. at 87. Because there was no prosecutorial misconduct or jurisdictional defect created by the license issue, the information that the licensure issue had occurred was not information favorable to the accused and material to guilt or punishment. It need not, therefore, have been disclosed.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.